

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-25-1998

# In Re: Marvel Ent

Precedential or Non-Precedential:

Docket 98-7001

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"In Re: Marvel Ent" (1998). *1998 Decisions.* Paper 59.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/59

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 25, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-7001, 98-7040 and 98-7041

IN RE: MARVEL ENTERTAINMENT GROUP, INC.; ASHER
CANDY COMPANY; FLEER CORPORATION; FRANK H.
FLEER CORPORATION; HEROES WORLD DISTRIBUTION,
INC.; MALIBU COMICS ENTERTAINMENT INC.; MARVEL
CHARACTERS, INC.; MARVEL DIRECT MARKETING INC.;
SKYBOX INTERNATIONAL, INC.; SPECIAL COUNSEL TO
DEBTORS; BOARD OF DIRECTORS OF MARVEL; HIGH
RIVER LIMITED PARTNERSHIP and WESTGATE
INTERNATIONAL, L.P.;

IN RE: JOHN J. GIBBONS, ESQ., Trustee for the Estate
in Bankruptcy of the Debtors;

MARVEL ENTERTAINMENT GROUP, INC.; ASHER CANDY
COMPANY; FLEER CORPORATION; FRANK H. FLEER
CORPORATION; MALIBU COMICS ENTERTAINMENT, INC.;
MARVEL CHARACTERS, INC.; MARVEL DIRECT
MARKETING INC.; SKYBOX INTERNATIONAL, INC.; HIGH
RIVER LIMITED PARTNERSHIP and WESTGATE
INTERNATIONAL, L.P.,

        Appellants in No. 98-7001;

JOHN J. GIBBONS, ESQ., Trustee for the Estate in
Bankruptcy of the Debtors,

        Petitioner in No. 98-7040,
        Appellant in No. 98-7041;

On Appeal from the United States District Court
for the District of Delaware
(D.C. 97-cv-00638)

Argued: March 10, 1998

Before: GREENBERG, SCIRICA and ALDISERT,
Circuit Judges,

(Filed: March 25, 1998)

        Edward S. Weisfelner (argued)
        John P. Biedermann
        BERLACK, ISRAELS & LIBERMAN
        120 West 45th Street
        New York, NY 10036

        Stephen W. Spence
        Steven K. Kortanek
        PHILLIPS, GOLDMAN & SPENCE
        1200 North Broom Street
        Bank of Delaware Building
        Wilmington, DE 19806

         ATTORNEYS FOR APPELLANTS/
         RESPONDENTS/APPELLEES
         High River Limited Partnership,
         Westgate International, L. P.

        Francis J. Menton, Jr.
        WILLKIE, FARR & GALLAGHER
        153 East 53rd Street
        One Citicorp Center
        New York, NY 10022

         ATTORNEY FOR APPELLEE
         Creditors Committee

        John S. Koppel (argued)
        William Kanter
        United States Department of Justice
        Civil Division, Appellate Staff
        601 D Street, N.W.
        Washington, DC 20530-0001

2

Anthony J. Ciccone, Jr.
Suite 780
Executive Offices of United States
 Trustees
901 E Street, N.W.
Washington, DC 20530

 ATTORNEYS FOR APPELLEE
 U.S. Trustee

Douglas S. Liebhafsky (argued)
WACHTELL, LIPTON, ROSEN &
 KATZ
51 West 52nd Street
New York, NY 10019

 ATTORNEY FOR APPELLEES
 Goldman Sachs Credit Partners,
 Morgan Stanley Emerging Markets,
 Lazard Freres & Co., Long Term
 Credit Bank of Japan, Whipporwill
 Assoc., Van Kampen America,
 Canadian Imperial Bank of
 Commerce, Merrill, Lynch, Pierce,
 Fenner & Smith, Inc., Bankers
 Trust Co., Dickstein & Co., L.P.,
 Dickstein Int'l Ltd., Lehman
 Commercial Paper, Inc., Sumitomo
 Bank, Ltd., Amroc Inv. Inc., M. D.
 Sass, Bank of Montreal,
 Chancellor Capital, Ceres Finance
 Ltd., Captiva, Value Partners,
 Banko Central Hispanamerico, IBJ
 Schroder Bank, Instituto Bancario
 San Paulo, Morgan Guaranty
 Trust Co. of New York, Scoggin
 Capital, Foothill Capital
 Corporation, CPR (USA)

CAROSELLI, SPAGNOLLI &
 BEACHLER
312 Boulevard of the Allies
8th Floor
Pittsburgh, PA 15222

 ATTORNEYS FOR APPELLEE
 Merrill, Lynch, Pierce, Fenner &
 Smith, Inc.

David B. Stratton
PEPPER, HAMILTON & SCHEETZ
1201 Market Street
Suite 1600
Wilmington, DE 19801-1163

 ATTORNEY FOR APPELLEE
 Toy Biz Inc.

Gary Schildhorn
Steven D. Usdin
ADELMAN, LAVINE, GOLD & LEVIN
1900 Two Penn Center
Philadelphia, PA 19102

 ATTORNEYS FOR APPELLEE/
 RESPONDENT
 Official Committee of Equity
 Security Holders

John J. Gibbons (argued)
GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE
One Riverfront Plaza
Newark, NJ 07102-5497

 PRO SE PETITIONER/APPELLANT

Joanne B. Wills (argued)
Mindy Friedman
KLEHR, HARRISON, HARVEY,
 BRANZBURG & ELLERS
919 Market Street, Suite 1000
Wilmington, DE 19801-3062

4

James E. Spiotto
Ann E. Acker
Mark D. Rasmussen
Timothy T. Finley
CHAPMAN & CUTLER
111 West Monroe Street
Chicago, IL 60603

 ATTORNEYS FOR RESPONDENT/
 APPELLEE
 LaSalle National Bank

Roderick R. McKelvie, Honorable
UNITED STATES DISTRICT COURT
District of Delaware
844 King Street
Wilmington, DE 19801

 NOMINAL RESPONDENT

OPINION OF THE COURT

ALDISERT, Circuit Judge.

These expedited and consolidated appeals require us to decide if the district court properly exercised its discretion by appointing a trustee in the bankruptcy of Marvel Entertainment Group, Inc., because of the extreme acrimony between the debtor-in-possession and the creditors. If we affirm the appointment, we must then decide if the court acted within its proper discretionary power by denying the motion of the trustee, John J. Gibbons, to appoint the law firm of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C. ("the Firm") as counsel to the trustee. The district court determined that the Firm's prior unrelated representation of Chase Manhattan Bank, a creditor in the bankruptcy, disqualified it from serving as trustee's counsel. We will affirm the appointment of the trustee and reverse the order denying Gibbons's motion for an order authorizing employment of the Firm as his counsel. Because our legal analysis necessarily involves a review of the district court's factual findings, we must first set out the adjudicative facts in some detail.

5

I.

Marvel and various corporate affiliates filed chapter 11 petitions on December 27, 1996 and continued to run Marvel as debtor-in-possession. 11 U.S.C. SS 1107-1108. Approximately 1,700 creditors held $1 billion in claims against the Marvel estate.

Both before and after the filing of the petitions, Westgate International, L.P. and High River Limited Partnership, each controlled by Carl Icahn, (the "Icahn interests"), purchased at a discount a substantial number of pre-petition debt claims and bonds which had been issued by several holding companies owning all or substantially all of Marvel's stock. These holding companies, under the control of Ronald Perelman, had pledged their Marvel stock as security for the bonds. Two groups loomed large in the bankruptcy proceedings: one was an Official Bondholders' Committee and an indenture trustee, LaSalle National Bank, chosen to act primarily on behalf of the Icahn interests; the other, various creditors of Marvel, known as "the Lenders," who held over $600 million in debt claims at the time of the filings, secured by all of Marvel's assets.

From the start of the proceedings, disputes arose among the various parties, especially between the Icahn interests and the Lenders. The Icahn interests opposed an initial bankruptcy financing plan submitted by the Perelman holding companies, under which the holding companies would have infused $100 million into Marvel in return for priority recognition of the Lenders' debt claims. The Icahn interests contended that the Perelman-controlled Marvel debtors were favoring their "lender accomplices" to ensure that "Perelman re-acquires control of Marvel, without competitive bidding, for an obscenely low price." Notwithstanding the Icahn interests' objections, the bankruptcy court approved the financing plan.

From January through June of 1997, tension arose between the Lenders and the Icahn interests. The Icahn interests fought to take control of the Marvel board of directors. Substantial litigation went forward. On January 13, 1997, the Icahn interests moved the bankruptcy court to lift the automatic bankruptcy stay, 11 U.S.C. S 362(a)(3),

6

so they could foreclose on the holding companies' defaulted bonds and vote the pledged stock. Marvel sought a temporary restraining order from the bankruptcy court to enjoin the Icahn interests from voting the stock and replacing Marvel's board of directors. The bankruptcy court issued the order on March 24, 1997. On the same day, the Lenders moved the bankruptcy court for an order appointing a responsible officer to take control of the bankruptcy, or in the alternative a trustee. That same month, the Icahn interests took significant steps toward gaining control of Marvel. They offered to infuse $365 million into Marvel, partially for operation of its business but mostly to repay $300 million of its secured debt, in return for "exclusive" control of Marvel's operations. Through their agent Chase Manhattan Bank, the Lenders vigorously opposed this plan, explaining that the Icahn interests had presented no "concrete turnaround strategy . . . or a management team capable of executing one."

On May 14, 1997, the district court vacated the bankruptcy court's temporary restraining order, permitting the Icahn interests to vote the pledged stock. In re Marvel Entertainment Group, Inc., 209 B.R. 832, 840 (D. Del. 1997). With the lifting of the restraining order, the litigation ended and the inevitable took place--on June 20, 1997, the Icahn interests took control of Marvel. Thus, an anomaly arose. The Icahn interests began to wear two hats--one as creditors of the holding companies that controlled Marvel; the other as the debtor-in-possession of Marvel.

Settlement negotiations proceeded throughout the summer of 1997. The new Icahn-controlled debtor-in-possession proposed a settlement in which the Icahn interests would control a newly-organized Marvel company merged with its affiliate Toy Biz, and would purchase the Lenders' claims at a substantial discount. To consummate the settlement, it was necessary to obtain the approval of two-thirds of all creditors as required under the Bankruptcy Code, 11 U.S.C. S 1126(c). The Lenders were not successful in obtaining this approval.

The parties tried again. Another proposed settlement was attempted by the Icahn interests, this time with Chase directly as one of the Lenders. The terms were similar to

those contained in the first effort, but this time Chase was required to sell its claims to the Icahn interests for even less than what was offered under the former proposal. Moreover, the settlement proposal required the creditors to support the Icahn interests' control of all Marvel entities and to agree to place High River's and Westgate's debt claims into a priority secured position. The necessary two-thirds approval not forthcoming, the settlement negotiations collapsed in October 1997.

On October 30, 1997, the Icahn-controlled debtor-in-possession commenced adverse litigation in the district court against the Perelman holding companies, the Lenders and other creditors in the Marvel bankruptcy (the "Perelman litigation"). It asserted 19 causes of action alleging breach of fiduciary duty, fraudulent conveyance, preferential transfer and breach of contract. The complaint sought to void the Lenders' claims or to subordinate them to the claims of High River and Westgate. The complaint described an alleged conspiracy between Toy Biz, the former Marvel board and the Lenders to "sabotage" the new Icahn-controlled debtor-in-possession's reorganization efforts. At the same time, the Icahn interests moved the district court for an order withdrawing the chapter 11 petitions and all related matters in the bankruptcy court and removing them to the district court to be heard in conjunction with the Perelman litigation. The Lenders opposed this withdrawal and renewed their motion before the bankruptcy court for the appointment of a trustee.

The district court noted that the Icahn interests instituted the Perelman litigation "by counsel who had not previously entered an appearance in this matter. Prior to the filing of the action, Marvel, as controlled by the Icahn interests, had not sought approval from the bankruptcy court to retain that counsel, nor had it sought approval to file the action." At a conference held by the district court to discuss its jurisdiction over the Perelman litigation, the court "invited the parties to submit papers on the jurisdictional issue, but made clear that it did not want to interfere with the bankruptcy court's ability to resolve the underlying dispute." Nonetheless, the day after the conference the Icahn interests sent a letter to the

8

bankruptcy court which, as the district court found, "incorrectly stated that while that motion [on jurisdiction] was pending, the bankruptcy court was required to refrain from taking further action." This caused the bankruptcy court to cancel its hearing on the appointment of a trustee.

At a district court hearing on November 13, 1997, all parties agreed to the withdrawal of the Marvel cases from the bankruptcy court and their transfer to the district court. The district court then heard argument on whether a trustee should be appointed. The argument was summarized by the court:

> In opposing the motion, the Debtors accuse the Lenders, and specifically Chase, of flip-flopping on positions throughout the life of this proceeding, whenever it suits their purposes. The Debtors describe the reorganization plan of the Lenders and Toy Biz as illegal, and claim that the Lenders have no desire that a neutral trustee be appointed. . . . They claim that the Lenders have put a strangle-hold on the Debtor's financing, and that the Lenders are responsible for failure of both the Settlement and the Second Settlement. They also repeat many of the allegations made in the Perelman litigation. . . .

> The Creditors Committee describes the relationship between the Icahn interests and the Lenders as having reached an "impasse." . . .

> In support of their motion, the Lenders accuse the Icahn interests of an elaborate scheme to take over Marvel at a discount price while diminishing the value of the Lender's claims on the company as creditors. They claim that the Perelman litigation is part of that scheme, and was brought, at least in part, as a weapon to punish the Lenders for not consummating the two Settlements. . . . The Lenders claim that the present board is incapable of neutrality, and is guilty of breaching its fiduciary duties to creditors.

Appellants High River's and Westgate's Ex. C at 7-8. On December 12, 1997, the district court granted the motion authorizing the United States Trustee to appoint a trustee.

9

Appealing that order are Marvel and the Icahn interests which control it.

The U.S. Trustee recommended Gibbons to serve as trustee. Pursuant to this recommendation, Gibbons disclosed that the Firm was representing Chase in an unrelated matter. The representation did not involve litigation, but only construction financing for the New Jersey Performing Arts Center, a community organization. The Firm's representation of Chase generated a total of $48,000 in fees in 1997, about 0.1% of the Firm's revenue that year. Its representation was virtually complete at the time Gibbons was selected as trustee. In addition, Gibbons disclosed that Chase had granted the Firm an unconditional waiver of any conflicts which might arise from Gibbons's service as trustee. The waiver included an authorization permitting the Firm to represent Gibbons in any matter adverse to Chase. The district court appointed Gibbons as trustee on December 22, 1997 after considering the U.S. Trustee's recommendation and reviewing Gibbons's disclosure form.

Gibbons subsequently moved for an order authorizing employment of the Firm as trustee's counsel. In conjunction with this motion, Gibbons submitted an affidavit from the Firm which was materially identical to Gibbons's prior disclosures in its description of the Firm's representation of Chase; it stated that the Firm had represented Chase "from time to time," and that it currently was representing Chase in the Arts Center financing.

In light of the Firm's relationship with Chase, the Icahn interests filed an objection to the Firm's employment as counsel, and LaSalle filed a preliminary statement with the district court questioning whether the Firm was "disinterested," as required by the Bankruptcy Code. 11 U.S.C. S 327(a). The Firm responded to this statement with a letter indicating that it could properly serve as trustee's counsel, documenting this claim with Chase's waiver of conflicts and a letter mutually terminating all attorney-client relations between Chase and the Firm.

The district court held a hearing on January 15, 1998 to consider the Firm's employment. At that time, the Firm's

10

representation of Chase had already been terminated. LaSalle argued that it wanted to reserve its rights to object to the Firm's employment if a conflict involving Chase later appeared, and stated that "[t]he appearance of a conflict of interest . . . creates some discomfort." Similarly, the Icahn interests said that "the termination of the [Firm's and Chase's attorney-client] relationship does go a long ways toward the legal issues that were presented," but that "we still have an appearance issue . . . that could impact on subsequent determinations by the trustee." Thus, it is clear that LaSalle and the Icahn interests were concerned not with an actual conflict of interest, but with the "appearance" that the Firm would not act impartially.

On January 27, 1998, the district court denied Gibbons's motion for an order authorizing employment of the Firm as trustee's counsel, reasoning that the Firm's "representation of Chase taints the image of objectivity that the trustee and his counsel should possess." Gibbons immediatelyfiled both this appeal challenging the district court's decision and a petition for a writ of mandamus.1  On February 12, 1998, we granted Gibbons's motion to expedite the appeal and petition and consolidated these cases with the Icahn interests' prior appeal from the appointment of a trustee.

We review the district court's findings of fact for clear error, conduct plenary review over its conclusions of law and review its decision to appoint a trustee for abuse of discretion. See In re Sharon Steel Corp., 871 F.2d 1217, 1222, 1225-1226 (3d Cir. 1989). The district court's disqualification of the Firm is reviewed for an abuse of discretion. See In re BH & P Inc., 949 F.2d 1300, 1317 (3d Cir. 1991). "An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." ACLU v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1476 (3d Cir. 1996) (internal quotation omitted).

_____

1. Because we will rule in Gibbons's favor on his direct appeal, it is unnecessary for us to consider his petition for mandamus. See In re Ford Motor Co., 110 F.3d 954, 964 (3d Cir. 1997). The petition therefore will be dismissed as moot.

II.

Because this is an appeal from a district court exercising original jurisdiction in bankruptcy, our jurisdiction stems from 28 U.S.C. S 1291, not from 28 U.S.C.S 158(d). See In re Amatex Corp., 755 F.2d 1034, 1038 (3d Cir. 1985). We apply a broader concept of "finality" when considering bankruptcy appeals under S 1291 than we do when considering other civil orders under the same section. Id. at 1039. A finality determination in a bankruptcy appeal involves consideration of such factors as "the impact of the matter on the assets of the bankruptcy estate, the preclusive effect of a decision on the merits, and whether the interests of judicial economy will be furthered." BH & P, 949 F.2d at 1306 (quoting F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 104 (3d Cir. 1988)). We see no reason to use conflicting standards when a district court, as distinguished from a bankruptcy court, has issued an order in bankruptcy directly. See Amatex, 755 F.2d at 1039 (stating in the context of S 1291 that "we have consistently considered finality in a more pragmatic and less technical way in bankruptcy cases").

We recognize that the Courts of Appeals are not in total agreement on whether a district court order appointing a bankruptcy trustee is interlocutory or final. See In re Cajun Elec. Power Coop., Inc., 69 F.3d 746, 748 (5th Cir. 1995) (appointment of bankruptcy trustee is an immediately appealable final order); In re Plaza de Diego Shopping Ctr., Inc., 911 F.2d 820, 826 (1st Cir. 1990) (same); Committee of Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 241 (4th Cir. 1987) (same). But see In re Cash Currency Exch., Inc., 762 F.2d 542, 548 (7th Cir. 1985) (unappealable); see also In re St. Charles Preservation Investors, Ltd., 916 F.2d 727, 729 (D.C. Cir. 1990) (district court order requiring confirmation of permanent trustee unappealable). Using the liberal finality rules which apply in bankruptcy matters of this nature, we believe that jurisdiction is proper over the order appointing a trustee here. In the past, we have exercised jurisdiction over a district court order affirming a bankruptcy court order appointing a trustee. Sharon Steel, 871 F.2d at 1222, 1225–1226; see also Plaza de Diego, 911 F.2d at 826 ("If an

appeal [from appointment of trustee] were postponed until a plan of reorganization were confirmed, there would be no satisfactory way to vindicate the" debtor's rights.). Were we to put off hearing an appeal of the district court's order appointing a trustee until after the entire bankruptcy proceeding, allowing the possibility of an order returning this bankruptcy to its very beginning for a second round, the concept of judicial efficiency would be effectively turned on its head. Liberal finality considerations in orders appointing bankruptcy trustees are necessary because these orders cannot be meaningfully postponed to the bankruptcy's conclusion.

Were we not to take jurisdiction at this juncture, no meaningful review of the order appointing a trustee could ever take place, as a practical matter. What we know as men and women we must never forget as judges. Once bankruptcy reorganization has been completed after months or years and after a plan of reorganization has been hammered out, it strains credulity to suggest that a reviewing court would jettison years of bankruptcy infighting, compromise and final determinations solely for the purpose of reversing the appointment of a trustee and have the proceedings begin again from scratch. The practical reality is that unless an appeal can be lodged now, there will never be a meaningful review of the order appointing a trustee. We therefore hold that jurisdiction over the district court's order appointing a trustee is proper pursuant to S 1291.

We believe that the overriding interests of judicial economy and the effective finality of the district court's decision give us jurisdiction also over Gibbons's appeal of the district court's order denying his motion for an order approving employment of the Firm as his counsel. Given that this Court has jurisdiction over the appeal of the appointment of a trustee, considerations of efficiency favor hearing this related appeal at the same time. Moreover, considering LaSalle's2 concession that the only way
_____

2. In addition to LaSalle, Appellees in Gibbons's appeal include the Icahn interests, the Official Equity Security Holders' Committee and Toy Biz, Inc. Only LaSalle and the Equity Committee filed briefs, and counsel for LaSalle argued the case alone. We understand the arguments presented by LaSalle to represent the Appellees' collective position.

13

Gibbons could properly continue to serve as trustee is to divest all interest in the Firm for the duration of his trusteeship, we perceive a most transparent effort to remove him as trustee without resort to meeting the burdens imposed by the Bankruptcy Code. See 11 U.S.C. S 324(a) (trustee may only be removed "for cause"). In addition, to delay the appeal of the order denying counsel until all matters in the bankruptcy have been conclusively determined is impractical, as in the situation of the order appointing the trustee. We will not overburden the courts of this judicial circuit by requiring the parties to conduct the entire bankruptcy proceeding with this issue hanging heavily over their heads when we can easily decide it now on the facts already on record. For these reasons, jurisdiction over Gibbons's appeal is proper pursuant to S 1291.

We will now turn to the merits of the appeals.

III.

Under the Bankruptcy Code, the district court was empowered to appoint a trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, . . . or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . .

11 U.S.C. S 1104(a). The party moving for appointment of a trustee, in this case the Lenders, must prove the need for a trustee under either subsection by clear and convincing evidence. See Sharon Steel, 871 F.2d at 1226. "It is settled that appointment of a trustee should be the exception, rather than the rule." Id. at 1225. In the usual chapter 11 proceeding, the debtor remains in possession throughout reorganization because "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." In

14

re V. Savino Oil & Heating Co., 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989). Thus, the basis for the strong presumption against appointing an outside trustee is that there is often no need for one: "The debtor-in-possession is afiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization." Petit v. New England Mort. Servs., 182 B.R. 64, 69 (D. Me. 1995) (internal quotations omitted). The strong presumption alsofinds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization. See Sharon Steel, 871 F.2d at 1226. The facts here, however, militate against invoking this presumption. The Icahn interests took control over Marvel's management six months after the chapter 11 filing. We are not confronted with a debtor who possesses extensive familiarity with the company's operations. It is therefore inappropriate to suggest that the usual presumption should be applied to a Johnny-come-lately debtor-in-possession, especially one that is also a substantial creditor.

The district court determined that the Icahn interests were "unable to resolve conflicts" with creditors of the estate. On the basis of this acrimony, it ordered the appointment of a trustee. We hold that the district court did not abuse its discretion because (A) this acrimony rises to the level of "cause" under S 1104(a)(1), and (B) a trustee would serve the best interests of the parties and estate.

A.

We have not heretofore addressed the question of whether acrimony between debtor and creditor in a bankruptcy case may rise to the level of "cause" necessitating the appointment of a trustee under S 1104(a)(1). Cf. Sharon Steel, 871 F.2d at 1228 (finding "cause" due to debtor-in-possession's gross mismanagement of estate and internal conflicts of interest). In Sharon Steel, we noted that the appointment of a trustee is mandatory upon a determination of cause, but also that "a determination of cause . . . is within the discretion of the

15

court." Id. at 1226 (quoting Dalkon Shield, 828 F.2d at 242). A review of cases from other circuits, as well as the policies behind the appointment of a trustee, demonstrates that the district court here properly exercised its discretion by invoking S 1104(a)(1) to reach its conclusion.

It is significant that the language of S 1104(a)(1) does not promulgate an exclusive list of causes for which a trustee must be appointed, but rather provides that a trustee shall be appointed "for cause, including fraud, dishonesty, incompetence, or gross mismanagement . . . or similar cause". The Court of Appeals for the Fourth Circuit has recognized that "the concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide range of conduct," and courts must be given the discretion necessary to determine if the debtor-in-possession's "conduct shown rises to a level sufficient to warrant the appointment of a trustee." Dalkon Shield, 828 F.2d at 242 (internal quotation omitted). This discretionary authority is consistent with a "policy of flexibility" permeating the Bankruptcy Code's overall aim of protecting creditors while giving debtors a second chance. Id. The Code itself, therefore, does not prohibit the appointment of a trustee based on a finding of acrimony between debtor and creditor, parties whose interests must be balanced and protected under the discretion of the courts.

Moreover, we are impressed by the persuasive reasoning in In re Cajun Elec. Power Coop., Inc., 74 F.3d 599, 600 (5th Cir.) (adopting on rehearing the opinion of dissent in 69 F.3d at 751), cert. denied, 117 S. Ct. 51 (1996), in which the court upheld a trustee appointment based on afinding of acrimony. In that case, the debtor-in-possession's interests conflicted with those of its creditors to such an extent that "the appointment of a trustee may be the only effective way to pursue reorganization." The debtor-in-possession was a utility cooperative whose board members were faced with a federal agency order lowering its utility rates. The debtor-in-possession's board members, themselves managers or members of the debtor-in-possession's individual member utility companies, were required to decide whether to appeal the agency order, seeking to maintain the high rates charged to the individual

member companies and thus to better enable the debtor-in-possession to meet its debt obligations to its creditors in bankruptcy, or to take no action and charge less to their individual companies. Cajun Elec., 69 F.3d at 747. The court recognized that the debtor-creditor conflict went "beyond the `inherent' conflicts under which all healthy cooperatives operate." Cajun Elec., 74 F.3d at 600 (adopting dissent at 69 F.3d at 751). The extent of this conflict alone provided sufficient cause for the appointment of a trustee under S 1104(a)(1).

In Cajun Electric, the court recognized that all cooperatives operate amidst certain "inherent" conflicts of interest, but rejected the notion that its holding created a " `per se rule' under which any cooperative seeking Chapter 11 protection would be automatically subject to the appointment of a trustee." Id. Rather, the teachings of this case are that a district court may find cause to appoint a trustee for "acrimony" only on a case-by-case basis, when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor, or as it found in that case, when the parties "begin working at cross-purposes".

We therefore adopt the reasoning in Cajun Electric, 74 F.3d at 600 (adopting dissent at 69 F.3d at 751), and apply its teachings to the case at bar. Here the district court found that "the Debtors, as controlled by the Icahn interests, and the Lenders, take dramatically different stances on many issues." Citing (1) the debtor-in-possession's institution of several adversary actions, (2) the unconsummated settlements, (3) the U.S. Trustee's opinion "that the parties seem to be unable to reach a consensus" and (4) its observations that "the Debtors and the Lenders have flung accusations at each other, and have failed to demonstrate any ability to resolve matters cooperatively," the district court concluded that "there is no reasonable likelihood of any cooperation between the parties in the near future." As in Cajun Electric, 74 F.3d at 600 (adopting dissent at 69 F.3d at 751), the district court did not clearly err, based on its review of these events, when it found a deep conflict to exist between the Icahn-controlled debtor-in-possession and the creditors in bankruptcy. Also like

17

Cajun Electric, "this is a large and messy bankruptcy that promises to get worse without a disinterested administrator at the helm." Id.; see also In re Colorado-Ute Elec. Assoc., Inc., 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (finding cause to appoint trustee under S 1104(a)(1) when the court could not "envision a way for the current management and board to resolve the inherent conflict between what is best for Colorado-Ute, its creditors and the co-op members").

We expressly hold that there is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee. In this case, rather, we are faced with circumstances in which the Icahn interests, themselves creditors of the Perelman holding companies, are currently in control of the debtor at the same time that the debtor proposes reorganization plans. In this position, although the Icahn interests are technically and officially fiduciaries to all creditors, they would also be placed in an awkward position of evaluating their own indenture and debt claims. Having found that this unhealthy conflict of interest was manifest in the"deep-seeded conflict and animosity" between the Icahn-controlled debtor and the Lenders and in the lack of confidence all creditors had in the Icahn interests' ability to act as fiduciaries, the district court did not depart from the proper exercise of discretion when it determined sufficient cause existed under S 1104(a)(1) to appoint a neutral trustee to facilitate reorganization.

We reject the Icahn interests' argument that unhappy creditors involved in future bankruptcies could remove the debtors-in-possession by their obstinate refusal to cooperate. We are not impressed by this argumentum ad terrorem. In the view we take, it is within the district court's sound discretion to make a determination of cause, and this requires fact-finding and application of the facts to relevant precepts. The district court here determined that the Icahn interests were not entirely without blame for the breakdown of reorganization efforts with the Lenders: "[T]here can be no question that the debtor-in-possession has demonstrated difficulty resolving its conflicts with other parties, such as the Lenders." The district court noted that the Icahn-controlled debtor-in-possession instituted

18

litigation against Perelman without seeking the approval of the bankruptcy court; moreover, the debtor-in-possession was represented by counsel who had not previously entered an appearance in the case. In addition, the day after the district court "made clear that it did not want to interfere with the bankruptcy court's ability to resolve the underlying dispute," the Icahn interests sent a letter to the bankruptcy court which "incorrectly stated that while that motion [on jurisdiction] was pending, the bankruptcy court was required to refrain from taking further action." This caused the bankruptcy court to cancel a hearing on the appointment of a trustee. Such actions by a debtor-in-possession have been sufficient for other courts to find cause for appointment of a trustee. See, e.g. , V. Savino Oil, 99 B.R. at 526 (debtor-in-possession failed to disclose to court corporate relationship with entity uninvolved in bankruptcy case and "made affirmative efforts to misrepresent or conceal" material matters).

Finally, the policies behind the appointment of a trustee support our conclusion. The appointment of a trustee is the installation of a court officer charged with fiduciary duties. The district court's determination that cause existed to appoint an independent trustee based on the Icahn interests' actions is a recognition of their failure to assume these duties. When the chapter 11 petition was filed in this case, the debtor-in-possession assumed the samefiduciary duties as would an appointed trustee; the Icahn interests later stepped into this fiduciary position when they took control of Marvel. See 11 U.S.C. S 1107(a); United States v. Whiting Pools, Inc., 462 U.S. 198, 200 n.3 (1983). These obligations include "[o]pen, honest and straightforward disclosure to the Court and creditors." See V. Savino Oil, 99 B.R. at 526. The Icahn interests' actions surrounding the Perelman litigation fall short of this fiduciary benchmark. Also among the fiduciary obligations of a debtor-in-possession is the "duty to protect and conserve property in its possession for the benefit of creditors." In re Ionosphere Clubs, Inc., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990). The intense and high-stakes bickering between the Icahn interests and the Lenders does not instill confidence that the Icahn interests could fairly negotiate with the creditors to whom they owe these duties, nor that reorganization will

19

occur effectively. See, e.g., In re Bellevue Place Assocs., 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) (finding no wrongful conduct by debtor-in-possession but an inability to control reorganization, thus an inability to discharge fiduciary duties, necessitating appointment of trustee "to unfreeze" unproductive negotiations).

As one bankruptcy court has noted:

> The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee.

V. Savino Oil, 99 B.R. at 526. Here, the district court acted within the proper bounds of discretion in appointing a trustee under S 1104(a)(1) because of the Icahn interests' contribution to the acrimony with Marvel's creditors.

B.

Unlike S 1104(a)(1), which provides for mandatory appointment upon a specific finding of cause, S 1104(a)(2) "envisions a flexible standard." It gives the district court discretion to appoint a trustee "when to do so would serve the parties' and estate's interests." Sharon Steel, 871 F.2d at 1226. Here the court found that "deep seeded conflict and animosity between a debtor and its creditors" is at the heart of this bankruptcy case, thus "the selection of a plan, whatever its details, is in the best interests of all parties, and the best way to achieve that result is to appoint a trustee." Even if we were of the view that the appointment of a trustee was not mandated by the analysis required in S 1104(a)(1), we are satisfied that the district court's determination would come within proper exercise of discretion under the flexible S 1104(a)(2) standard. The level of acrimony found to exist in this case certainly makes the appointment of a trustee in the best interests of the parties and the estate.

20

In Petit, 182 B.R. at 70, for example, numerous discovery disputes between the debtor-in-possession and creditors led the bankruptcy court to appoint a trustee, a decision upheld by the district court because this "may be the only way that the bankruptcy court can ensure that reorganization will proceed." The district court in that case described the impasse reached between the parties:

> The tangled history of these proceedings suggests that "friction" will continue at an unacceptable level. While some degree of antagonism and animosity between a debtor and creditors can be expected in any bankruptcy proceeding, it has reached a particular intensity here which is complicating efforts to "reorganize" the Debtor.

Id. The court also focused on the discretionary nature of the appointment decision, which involves to some extent weighing equities, stating, "the balance of interests here weighs in favor of appointing a trustee." Id. at 71.

Similarly in this case, the district court's lengthy account of this complex bankruptcy case, in which "the parties are sharply divided on many issues, and are presently incapable of resolving them," supported its exercise of discretion to appoint a trustee, exactly as the court had done in Petit. See id. at 70 ("deep-seeded conflict and animosity between a debtor and its creditors provides a basis for the appointment of a trustee"); see also Colorado-Ute, 120 B.R. at 176 (appointment of trustee in interests of parties where "serious conflicts . . . between and among the debtor, its board and creditors [made] the prospect for gridlock seem more probable than the ability to rehabilitate the debtor"); In re The Bible Speaks, 74 B.R. 511, 512 (Bankr. D. Mass. 1987) (appointing trustee when"friction [had] developed between the Debtor and the Creditors' Committee which threaten[ed] to engulf this estate in costly and legalistic bickering over the entire range of the reorganization process").

We also reject the Icahn interests' arguments that the district court must apply a strict cost-benefit analysis when deciding to appoint a trustee. This is a case of profound financial magnitude, involving approximately $1 billion in

21

claims against the estate. See In re Sharon Steel Corp., 86 B.R. 455, 466 (W.D. Pa. 1988) ("In a case of this magnitude, the cost of having a trustee in place is insignificant when compared with the other costs of administration and when compared with the enormous benefit to be achieved by the establishment of trust and confidence in . . . management.").

Neither did the court abuse its discretion by deciding not to appoint an examiner in the trustee's stead: "I'm just not convinced that an examiner is going to get done what needs to get done here. I think we need a decision-maker to come in and make some decisions." See Petit, 182 B.R. at 72 ("it would be more efficient and less costly simply to appoint a trustee now . . . since a trustee has the power to perform all of the functions of an examiner"). Under the Bankruptcy Code, a trustee is given all the powers of an examiner to analyze and report on the interests of the parties and actions of the debtor, but is also given the power to act on behalf of the estate, including the filing of a reorganization plan. 11 U.S.C. SS 1106(a)(5), (b). An examiner is not a substitute for a trustee. The district court need not have favored the appointment of an examiner here, especially after finding that a trustee is the more appropriate position. See In re Patton's Busy Bee Disposal Serv., Inc., 182 B.R. 681, 685 (Bankr. W.D.N.Y. 1995) ("The position of examiner is not a device to circumvent the appointment of a trustee.").

Whether viewed from S 1104(a)(1) or (a)(2), the district court acted within appropriate bounds of discretion in appointing a trustee to act as a neutral and efficient fiduciary in this complicated bankruptcy under the circumstances of the strife-ridden history presented here.

IV.

Having concluded that the district court was within its discretion in ordering the appointment of a trustee, we turn now to Gibbons's appeal. Gibbons argues that the district court erred when it disapproved the employment of the Firm as trustee's counsel.

22

The Bankruptcy Code allows the trustee of a bankruptcy estate to employ attorneys to assist him in his duties. 11 U.S.C. S 327(a). In determining the standards under which an attorney may serve in this capacity, we must, of course, begin with the language of the statute. Section 327(a) first provides that the trustee may employ attorneys "that do not hold or represent an interest adverse to the estate." See also S 327(c) (district court shall disapprove trustee's employment of an attorney who has represented a creditor "if there is an actual conflict of interest"). Section 327(a) also requires that the attorney be a "disinterested person[ ]." A "disinterested person" is defined, in relevant part, as a person who:

> does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

11 U.S.C. S 101(14)(E). A plain reading of this section suggests that one is a "disinterested person" only if he has an interest that is materially adverse to a party in interest in the bankruptcy. The interest in question may be materially adverse either for one of the specific reasons delineated in the statute or "for any other reason."

We conclude that in considering Gibbons's motion for an order authorizing employment of the Firm as trustee's counsel, the district court applied an incorrect legal standard under SS 327(a) and 101(14)(E), and even under the proper standard its denial of the motion was not a permissible exercise of discretion.

A.

We previously interpreted the standards applicable to employment of trustee's counsel under SS 327(a) and 101(14)(E) in BH & P, 949 F.2d 1300. Insofar as both parties have somewhat misread BH & P, and urge upon us such conflicting interpretations of it, we have studied our previous decision in great detail and today expressly

reiterate its holding: (1) Section 327(a), as well as S 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion--pursuant to S 327(a) and consistent with S 327(c)--disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the appearance of conflict alone.

In BH & P, an S corporation and both of its principal shareholders each filed for bankruptcy. The cases were consolidated and a single trustee and law firm were appointed to represent all three estates. Id. at 1303. After the corporation filed a fraud and breach of fiduciary duty suit against the shareholders, the corporation's primary secured lender alleged that the trustee and the lawfirm had a conflict of interest. Id. at 1304. The district court disqualified the trustee and the law firm from serving the shareholders' estates, and we affirmed.

In reiterating BH & P's precise rule on attorney disqualification under S 327(a), we focus only on that section of BH & P which discussed the standards for attorney disqualification. In Part IV of the opinion, we said:

> While the bankruptcy court recognized that by the terms of section 327(c) "disapproval of employment is mandatory where there is an actual conflict," it does not follow "that there is no discretion [under section 327(a)] to disapprove employment when the conflict is `potential' ". The court then held that

> [t]he court should generally disapprove employment of a professional with a potential conflict, with certain possible exceptions. First of all, . . . there may occasionally be large cases where every competent professional in a particular field is already employed by a creditor or a party in interest . . . .

> The other exception is where the possibility that the potential conflict will become actual is remote, and the reasons for employing the professional in question are particularly compelling. This court will not attempt here to define the parameters of this exception, which necessarily will depend upon the

24

> facts of a particular case. I will, however, note that even in such situations, employment of a professional with a potential conflict is disfavored.
>
> We do not find error in the bankruptcy court's articulation of the standard governing conflict of interest applicable to professionals. . . . As we have said, denomination of a conflict as "potential" or "actual" and the decision concerning whether to disqualify a professional based upon that determination in situations not yet rising to the level of an actual conflict are matters committed to the bankruptcy court's sound exercise of discretion.

Id., 949 F.2d at 1316–1317 (citations omitted).

This passage clearly indicates that S 327(a) allows disqualification of attorneys only if they have an actual or a potential conflict of interest. In addition, the first sentence of the passage cuts against the trustee's contention, in light of S 327(c), that the Firm may only be disqualified based on an actual conflict.

We reiterate the teachings of BH & P: Section 327(a) presents a per se bar to the appointment of a lawfirm with an actual conflict, and gives the district court wide discretion in deciding whether to approve the appointment of a law firm with a potential conflict. Therefore, the district court erred when it held that it could disqualify as disinterested any person who "in the slightest degree might have some interest or relationship that would even faintly color the independence and impartial attitude required by the Code and the Bankruptcy Rules." App. at 39 (quoting BH & P, 949 F.2d at 1308, in turn quoting isolated language from the district court opinion in that case, not our discussion of the standards for attorney disqualification). Following this faulty reasoning, LaSalle contends that section 327(a), as interpreted in BH & P, allows disqualification of a law firm for a mere "appearance of impropriety." We disagree with this contention.

To be sure, BH & P, 949 F.2d at 1313, does contain a reference to the "appearance of conflict." For several reasons, however, we find this reference to be"a marginal comment [which] will not bear the heavy weight [LaSalle

25

has] placed on it." See Rivet v. Regions Bank, 66 U.S.L.W. 4132, 4134 (U.S. Feb. 24, 1998) (declining to credit a previous footnote that was not essential to the decision in the previous case). First, part IV of BH & P, which interprets section 327(a) and from which we quoted extensively above, makes no mention whatsoever of appearances of conflict. Part IV mentions only actual and potential conflicts. Second, we do not believe that BH & P's discussion of S 101(14)(E)'s disinterest requirement, as applied to the disqualification of a trustee, mandates a conclusion that apparent conflicts alone allow a finding of disinterestedness. In this context, we said in BH & P that "[i]n some circumstances, the potential for conflict and the appearance of conflict may, without more, justify removing a trustee from service." Id. at 1313. At the risk of parsing language too finely, the conjunctive reference to potential conflict and appearance of conflict indicates that the two together, but not appearance alone, can justify disqualification. This conclusion is supported by the next passage of our opinion, where we note that "it must be made clear that `[h]orrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending [the trustee] away to lick his wounds.' " Id. (quoting In re Martin, 817 F.2d 175, 183 (1st Cir. 1987)). To allow disqualification merely on the "appearance of impropriety" indeed would allow"horrible imaginings alone" to carry the day. Finally, in BH & P we affirmed the district court's determination that the attorneys in that case had an "actual conflict of interest." Id. at 1315, 1317. In light of this determination, we do not find BH & P's transitory reference to the appearance of conflict to be controlling. We therefore reject LaSalle's invitation to read an appearance of conflict disqualification into S 327(a). Section 327(a) permitted the district court to disqualify the Firm only if it had an actual or potential conflict of interest.

B.

Even applying the proper standard, the district court's disqualification of the Firm would amount to an abuse of discretion. The Firm's conflict here is not potential or

26

actual. LaSalle acknowledges as much when it states that its concern is "the ability of [the Firm] to act with total objectivity and avoid even the appearance of `possible unfairness and partiality.' " LaSalle's Br. at 28 (quoting the district court's opinion). The Firm has never represented Chase on a matter related to this bankruptcy and severed all attorney-client relations with Chase in anticipation of its selection as trustee's counsel. If we were to uphold the district court's order under these circumstances, it is with the utmost difficulty that we could imagine how a law firm with any prior relationship to a secured creditor could ever serve as trustee's counsel. Such a result would be tantamount to a per se rule, which we refused to adopt in BH & P.

The district court's exercise of its discretion is further called into question by the anomalous situation in which it approved Gibbons's appointment as the trustee in this case, and then disapproved the employment of the Firm, in which he is the first named partner, as trustee's counsel. Sauce for the goose, then, is not sauce for the gander. The disclosures in reference to both Gibbons's appointment and the Firm's employment are the same. They revealed the Firm's representation of Chase and that Chase had granted the Firm an unconditional waiver of conflicts. Also, unlike when the court approved Gibbons's appointment as trustee, while the motion for approval of the Firm's employment as counsel was pending, Chase and the Firm terminated their attorney-client relationship. Given these facts, a logical basis for this inconsistency is evanescent, if not infinitesimal. There is an irreconcilable conflict with dictates of good reason in the notion that Gibbons, as the head of the Firm, is eligible to serve as trustee, but the Firm is ineligible to serve as his counsel.

This anomaly is particularly troubling and augments the primary reason why we reverse the district court's denial of the trustee's motion. We reverse the district court because it utilized a faulty premise in reaching its conclusion. It applied the incorrect legal standard and thus strayed beyond an appropriate exercise of discretion by disqualifying the Firm under S 327(a) based solely on the appearance of conflict. The trustee was within his rights

27

and prerogative to select the Firm as his counsel. To deny the trustee's choice was to commit reversible error.

* * * * * * * * *

In sum, we have jurisdiction under 28 U.S.C. S 1291 to review the district court's orders authorizing appointment of the bankruptcy trustee and disapproving the Firm as trustee's counsel. The district court properly exercised its discretion in appointing a trustee under either 11 U.S.C. S 1104(a)(1) or (a)(2) because "cause" includes the acrimony found here between the Icahn-controlled debtor-in-possession and the creditors and because on these facts the appointment of a trustee was in the best interests of the parties and the bankruptcy estate. Therefore, its order appointing a trustee will be affirmed.

The district court exceeded permissible bounds of discretion, however, when it applied an inappropriate legal precept to deny Gibbons's motion for an order authorizing employment of the Firm as trustee's counsel. The Firm does not have an actual or potential conflict of interest and may not be disqualified under 11 U.S.C. SS 327(a) and 101(14)(E). The district court's order will be reversed, and the case will be remanded with directions that the district court enter an order approving the Firm's employment.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

28