

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-6-2000

# In Re: Cybergenics Corporation

Precedential or Non-Precedential:

Docket 99-5592

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"In Re: Cybergenics Corporation" (2000). *2000 Decisions.* Paper 187.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/187

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 6, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-5592

IN RE: CYBERGENICS CORPORATION,
        Debtor

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF CYBERGENICS CORPORATION,
On behalf of Cybergenics Corporation,
Debtor in Possession,
        Appellant

v.

SCOTT CHINERY; L&S RESEARCH CORPORATION; FIRST
UNION NATIONAL BANK OF NORTH CAROLINA; BANQUE
INDOSUEZ; SUNAMERICA LIFE INSURANCE COMPANY;
LINCOLNSHIRE MANAGEMENT INC; LINCOLNSHIRE
EQUITY FUND, L.P.

On Appeal From the United States District Court
For the District of New Jersey
(D.C. No. 98-cv-03109)
District Judge: Honorable Garrett E. Brown, Jr.

Argued June 12, 2000
Before: BECKER, Chief Judge,
RENDELL, and ALDISERT, Circuit Judges

(Filed: September 6, 2000)

Gary D. Sesser [ARGUED]
James Gadsden
Carter, Ledyard & Milburn
2 Wall Street
New York, NY 10005
Counsel for Appellant

Brian J. Molloy [ARGUED]
Wilentz, Goldman & Spitzer
90 Woodbridge Center Drive
Woodbridge, NJ 07095
Counsel for Appellee
Scott Chinery

Dennis F. Dunne [ARGUED]
Milbank, Tweed, Hadley & McCloy
One Chase Manhattan Plaza
New York, NY 10005
Counsel for Appellees
First Union National Bank of
North Carolina; Banque Indosuez;
Sunamerica Life Ins.

Michael A. Zindler
Teich, Groh, Frost & Zindler
691 State Highway 33
Trenton, NJ 08619
Counsel for Appellees
First Union National Bank of
North Carolina; Banque Indosuez;
Sunamerica Life Ins.

Scott A. Eggers [ARGUED]
Proskauer Rose
1585 Broadway
New York, NY 10036
Counsel for Appellees
Lincolnshire Mgt. Inc.;
Lincolnshire Equity

OPINION OF THE COURT

RENDELL, Circuit Judge:

In this appeal, we consider whether certain fraudulent
transfer claims arising from transfers made by Cybergenics
Corporation were included in a sale of all assets of
Cybergenics so as to foreclose its creditors from thereafter
pursuing those claims on behalf of its bankruptcy estate.
For the reasons explained below, we conclude that the sale
of all of Cybergenics' assets did not encompass these claims
and we therefore will reverse the District Court's dismissal
of the creditors' complaint.

We have jurisdiction under 28 U.S.C. S 1291. We exercise
plenary review over the District Court's dismissal of this
action under Rule 12(b)(1) of the Federal Rules of Civil
Procedure. See United States Securities and Exchange
Comm'n v. Infinity Group Co., 212 F.3d 180, 186 n. 6 (3d
Cir. 2000).

Facts and Procedural History

Cybergenics, originally known as L&S Research
Corporation, was a successful marketer of body-building
and weight loss products under the Cybergenics name. In
1994, L&S was sold in a leveraged buyout, and the newly
formed Cybergenics Corporation became burdened with
more than $60 million of debt that was secured by
substantially all of Cybergenics' assets.1  In August 1996,
Cybergenics filed a petition for relief under chapter 11 of
the Bankruptcy Code, operating as a debtor in possession.
See 11 U.S.C. SS 1101(1), 1108.

Shortly after filing for bankruptcy, Cybergenics entered
into an agreement to sell nearly all of its assets to a third
party for $2.5 million. At the ensuing auction sale, held
under the auspices of the Bankruptcy Court in October
_____

1. The original purchase price was over $110 million, but as the result
of a settlement of a dispute between the parties, the purchase price was
later reduced to approximately $60 million.

3

1996, another party who bid $2.65 million was the successful purchaser of all Cybergenics' assets.

The sale agreement and the sale order approving the 1996 asset sale made clear that the purchaser bought "all of the rights, title, and interest of Cybergenics in and to all of the assets and business as a going concern of Cybergenics." App. 77. The sale order provided that the acquired assets included, without limitation, a variety of categories of business-related property such as trade accounts receivable, inventory, and various types of intellectual property. The sale order was not appealed and the sale was consummated.

Thereafter, Cybergenics moved to dismiss its bankruptcy case, averring that dismissal would be in the best interest of the bankruptcy estate because it "has no employees, no ongoing business operations, has liquidated its assets and disbursed the Sale Proceeds, has no ability to reorganize and has no estate to administer." App. 202. The chair of the Committee of Unsecured Creditors ("Committee") objected to the dismissal, contending that the transactions comprising the 1994 leveraged buyout should be investigated and could give rise to causes of action to avoid the transactions that Cybergenics could bring on behalf of the bankruptcy estate in its capacity as debtor in possession. Although Cybergenics agreed to adjourn its motion to dismiss to permit the Committee chair's counsel to investigate potential fraudulent transfer claims arising from the 1994 leveraged buyout, Cybergenics decided not to exercise its power as debtor in possession to pursue such an action itself, explaining that it doubted that such actions would benefit the bankruptcy estate.[2]

Based on its investigation, and Cybergenics' refusal to pursue these claims, the Committee sought leave from the Bankruptcy Court to bring a state law fraudulent transfer action on behalf of the bankruptcy estate in Cybergenics'

_____

2. Cybergenics provided an additional reason for not pursuing claims against the other parties to the leveraged buyout, namely, that it already had released any claims that Cybergenics itself might have against them pursuant to the settlement of a lawsuit it had filed alleging, inter alia, fraud, breach of contract, and breach of fiduciary duty.

4

stead.[3] In opposition, those who would be named defendants in the Committee's suit took the position that the Committee could not bring the action because the claims asserted therein had been sold in the 1996 asset sale. The Bankruptcy Court authorized the Committee to pursue the fraudulent transfer action without deciding whether the underlying claims had been transferred in the 1996 asset sale; it equivocated on this point, noting that "[c]ontrary to the Banks' assertion, the sale of the business assets of the Debtor did not necessarily include the sale of avoidance rights of the debtor-in-possession." App. 369. In March of 1998, the Committee filed its complaint alleging that Cybergenics made transfers and incurred obligations in connection with the 1994 leveraged buyout that were constructively fraudulent under New Jersey law. The defendants filed motions to dismiss the complaint, reiterating their argument that the fraudulent transfer claims asserted by the Committee had been sold in the 1996 asset sale.

The District Court[4] granted the defendants' motions and dismissed the Committee's complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Opining that the fraudulent transfer claims were "property of the estate" under 11 U.S.C. S 541, the District Court concluded that Cybergenics had sold them to the purchaser in the 1996 asset sale. The District Court reasoned that the concept of "property of the estate" under section 541(a) includes causes of action existing at the time a petition for bankruptcy relief is filed. The District

_____

3. Only a trustee (or debtor in possession) is authorized to exercise the power to avoid certain transfers or obligations. However, as the Bankruptcy Court explained in this case, see App. 362, courts have at times authorized individual creditors or creditors' committees to exercise avoidance powers under certain circumstances, particularly when the debtor in possession is unwilling to pursue a colorable claim that would benefit the bankruptcy estate. See, e.g., Canadian Pacific Forest Prods., Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.) , 66 F.3d 1436, 1438 (6th Cir. 1995).

4. The District Court resolved the motion instead of the Bankruptcy Court because the District Court withdrew the reference of this proceeding from the Bankruptcy Court. See 28 U.S.C. 157(a), (d).

5

Court decided as well that fraudulent transfer claims were in the nature of contract claims, as opposed to tort claims, and therefore were assignable. Thus, the District Court concluded that the Committee's complaint must be dismissed because the claims asserted therein had been sold to the successful purchaser in the 1996 asset sale.

Discussion

To resolve this appeal, we must determine whether the fraudulent transfer claims asserted in the action dismissed by the District Court were, in fact, transferred in the 1996 asset sale, and, accordingly, must construe the sale order in accordance with its terms. The Bankruptcy Court's order authorized and directed Cybergenics to "sell and transfer the assets under the Agreement" to the purchaser, and set forth a nonexhaustive list of examples, which included business-related assets such as trade accounts receivable, inventory, fixed assets, and various types of intellectual property. It noted further that "any references in the Agreement or in the Schedules attached thereto to any assets to be excluded from the sale are hereby deleted as it is acknowledged that all of the assets of the Debtor[defined to include Cybergenics as debtor and debtor in possession] are being conveyed to the Purchaser." App. 187. Like the sale order, the underlying sale agreement referred to the sale of all assets of Cybergenics as debtor and debtor in possession.

Our reading of these documents, which clearly authorized the sale of all assets of Cybergenics, directs our focus to one inquiry: were fraudulent transfer claims, which arose from transfers made and obligations incurred by Cybergenics in the 1994 leveraged buyout, assets of Cybergenics? If not, the 1996 asset sale is not an impediment to the Committee's lawsuit.5

_____

5. We will restrict our discussion to this one issue because we view it as dispositive. We reject Appellees' other arguments-- namely, that the claim is barred by one or more of the following: res judicata, releases previously given, absence of an actual creditor who could avoid the transfer, impropriety of collapsing the transaction, and existence of a recoupment defense -- because they lack merit and do not warrant discussion.

Determining the "ownership" of a claim or cause of action would seem to be a relatively straightforward inquiry requiring that we evaluate the nature of the cause of action at issue. However, the overlay of bankruptcy complicates our analysis. Thus, we will explore the nature of the fraudulent transfer claim, but we also will review fundamental bankruptcy principles regarding the status and powers of the debtor in possession in relationship to such a claim, including the legal fiction -- the avoidance power provided in 11 U.S.C. S 544(b) -- that enables a debtor in possession to bring certain causes of action that actually belong to its creditors.

Fraudulent Transfer Action

The Committee's complaint challenges transfers that Cybergenics made to the defendants, and obligations that Cybergenics incurred for the defendants' benefit, in connection with the 1994 leveraged buyout. The complaint accordingly seeks recovery from the defendants based on New Jersey fraudulent transfer law. If state law provided that this cause of action actually belonged to, and inured to the benefit of, the transferor, Cybergenics, we might readily conclude that it was Cybergenics' asset and was sold in the 1996 asset sale. However, that is not the case. As we explain below, fraudulent transfer claims have long belonged to a transferor's creditors, whose efforts to collect their debts have essentially been thwarted as a consequence of the transferor's actions, and that tradition continues today.

The Uniform Fraudulent Transfer Act, as adopted into New Jersey law, authorizes Cybergenics' creditors to seek avoidance of a fraudulent transfer or obligation that it has made to or incurred for the benefit of a third party.[6] One provision, for example, which addresses transfers and obligations that may be fraudulent as to present and future creditors, states as follows:

> A transfer made or an obligation incurred by a debtor

_____

6. Other remedies are available as well in addition to avoidance, such as attachment or other provisional remedies against the asset transferred. See N.J. STAT. ANN.S 25:2-29.

7

is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . .

N.J. STAT. ANN. S 25:2-25 (emphasis added).7

This creditors' remedy is age-old. See Orr v. Kinderhill Corp., 991 F.2d 31, 34-35 (2d Cir. 1993) (citing Twyne's Case, 76 Eng. Rep. 809 (Star Chamber 1601)); Barry L. Zaretsky, The Fraudulent Transfer Law as the Arbiter of Unreasonable Risk, 46 S.C. L. REV. 1165, 1168 (1995) (citations omitted) (explaining that fraudulent transfer law started as part creditor protection and part criminal law, but evolved into a law primarily for creditor protection). See generally Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 43 (1989) (tracing the history of fraudulent transfer actions to determine whether they historically were considered actions at law or at equity). A preeminent scholar in this area of the law emphasized the creditor focus of fraudulent transfers as he commenced his well-known treatise:

> The fraudulent conveyance, as known in our law, may be roughly defined as an infringement of the creditor's right to realize upon the available assets of his debtor. That, and none other, is the meaning that should attach to the word "fraud," as used in the synonymous term, "conveyance in fraud of creditors." It follows that an appreciation of this form of wrongdoing involves, first of all, a clear understanding of the right which is impaired.

GARRARD GLENN, THE LAW OF FRAUDULENT CONVEYANCES S 1 (1931). See also; PETER A. ALCES, THE LAW OF FRAUDULENT TRANSACTIONS P 1.01[2] at 1-3, P 5.04 at 5-112 (1989) (citations omitted). The precise requirements for

_____

7. Similarly, a provision addressing transfers that may be fraudulent as to only present creditors also states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation . . .

N.J. STAT. ANN. S 25:2-27(a) (emphasis added). See also id.SS 25:2-27(b).

8

successfully alleging that a transfer or obligation is fraudulent have evolved over time, see United States v. Green, 201 F.3d 251, 254 (3d Cir. 2000), but the fundamental creditors' rights premise, reflected in New Jersey's enactment of the Uniform Fraudulent Transfer Act, has not.

Thus, at least outside of the context of bankruptcy, it is clear that a fraudulent transfer claim arising from Cybergenics' transfers and obligations belongs to Cybergenics' creditors, not to Cybergenics. Other applicable nonbankruptcy laws may give Cybergenics various causes of action with which to challenge its own transactions and obligations, but a fraudulent transfer action is not among them. Having established this, we will examine if the answer changes when the transferor becomes a chapter 11 debtor in possession.

Status and Duties of a Debtor in Possession and the Avoidance Powers

There would be no appeal before us were it not for the fact that the Bankruptcy Code empowers trustees as well as chapter 11 debtors in possession to avoid transfers as fraudulent using causes of action that state law provides to creditors. Does this mean that the chapter 11 debtor in possession actually acquires its creditors' fraudulent transfer claims against third parties as a result offiling for bankruptcy? As explained below, the answer is clearly "no."

The term "debtor in possession" refers to a debtor in a chapter 11 case for which no trustee has been appointed. See 11 U.S.C. S 1101(1). When no trustee is appointed, the Bankruptcy Code gives a debtor in possession the powers and duties of a trustee. Id. S 1107(a); FED. R. BANKR. P. 9001(10). See also In re Marvel Entertainment Group, Inc., 140 F.3d 463, 474 (3d Cir. 1998). The terms "trustee" and "debtor in possession," as used in the Bankruptcy Code, are thus essentially interchangeable. See L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.), 209 F.3d 291, 297 & n. 7 (3d Cir. 2000). Hence, by virtue of being a debtor in possession, Cybergenics operated not only as a business entity, but essentially as a trustee as well. See Commodity Futures Trading Comm'n v. Weintraub,

471 U.S. 343, 355 (1985) (citing Wolf v. Weinstein, 372 U.S. 633, 649-652 (1963)).

A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors. See Marvel, 140 F.3d at 471, 473-474. See generally Weintraub, 471 U.S. at 352. To fulfill this duty, trustees and debtors in possession have a variety of statutorily created powers, known as avoidance powers, which enable them to recover property on behalf of the bankruptcy estate.

Section 544(b) is the operative avoidance power at issue here. Specifically, this provision authorizes the avoidance of "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowable] unsecured claim." 11 U.S.C. S 544(b) (emphasis added). The avoidance power provided in section 544(b) is distinct from others because a trustee or debtor in possession can use this power only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action.8 Yet, once avoidable pursuant to this provision, the transfer is avoided in its entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim. See Moore v. Bay (In re Sassard & Kimball, Inc.), 284 U.S. 4, 5 (1931). See also 11 U.S.C. S 551 (automatically preserving an avoided transfer for the benefit of the estate).

The fact that section 544(b) authorizes a debtor in possession, such as Cybergenics, to avoid a transfer using

---

8. Section 548 of the Bankruptcy Code also authorizes a trustee (or debtor in possession) to avoid fraudulent transfers and obligations, and, unlike section 544(b), is not contingent upon the identification of an actual unsecured creditor with a state law cause of action. However, among other differences, section 548 can be used to avoid only transfers or obligations by the debtor that were made or incurred on or within one year before the filing of the bankruptcy petition. Thus, the District Court
determined that a fraudulent transfer action arising from transfers and obligations associated with the 1994 leveraged buyout could not be pursued under section 548 and the Committee did not appeal that determination.

10

a creditor's fraudulent transfer action does not mean that the fraudulent transfer action is actually an asset of the debtor in possession, nor should it be confused with the separate authority of a trustee or debtor in possession to pursue the prepetition debtor's causes of action that become property of the estate upon the filing of the bankruptcy petition. See, e.g., Sender v. Simon, 84 F.3d 1299, 1304 (10th Cir. 1996) (explaining the difference between these separate grants of authority). Rather, it simply enables a debtor in possession to carry out its trustee-related duties.

The power to avoid the debtor's prepetition transfers and obligations to maximize the bankruptcy estate for the benefit of creditors has been called a "legalfiction" by one court. See Zilkha Energy Co. v. Leighton, 920 F.2d 1520, 1523 (10th Cir. 1990). It puts the debtor in possession "in the overshoes" of a creditor. See Benjamin Weintraub and Alan N. Resnick, BANKRUPTCY LAW MANUAL P 7.04, 7-15 (3d Ed. 1992) (quoting Schneider v. O'Neal, 243 F.2d 914, 918 (8th Cir. 1957)). This attribute is no more an asset of Cybergenics as debtor in possession than it would be a personal asset of a trustee, had one been appointed in this case. Much like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the debtor in possession is similarly endowed to bring certain claims on behalf of, and for the benefit of, all creditors.

As further evidence that the avoidance powers neither shift ownership of the fraudulent transfer action to the debtor in possession, nor are themselves a debtor's assets, we note that courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves. See, e.g., Wellman v. Wellman (In re Wellman), 933 F.2d 215, 218 (4th Cir. 1991) (holding that the avoidance powers provide for recovery only if the recovery is for the benefit of the estate); Vintero Corp. v. Corporacion Venezolana (In re Vintero Corp.), 735 F.2d 740, 742 (2d Cir. 1984) ("Vintero was given the right to avoid CVF 's security interest in order to protect such third parties, not to create a windfall for Vintero itself . . . To the extent that other

11

creditors of Vintero are not affected adversely by enforcement of CVF 's security interest, there is no reason why such interest should not be enforced."). 9 Rather than improving the debtor's own bottom line, empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors. See Thomas H. Jackson, Avoiding Powers in Bankruptcy, 36 STAN. L. REV. 725, 749 (1984); Charles Jordan Tabb, THE LAW OF BANKRUPTCY S 6.2 at 336 (1997); American Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.) , 714 F.2d 1266, 1278 (5th Cir. 1983) (holding that the automatic stay prevents an individual creditor from pursuing an avoidance action for its own exclusive benefit rather than for the benefit of all creditors, noting that"the principle of first-come-first-served has no place in bankruptcy law except to the very limited extent that specific provisions give it a place"). The use of this authorization for the benefit of creditors is at the heart of the avoiding powers.

Appellees urge that we should conclude that Cybergenics did, in fact, sell the right to pursue the claim in the 1996 asset sale based on their interpretation of cases from other courts, including one of our sister courts of appeals, involving express assignments of avoidance powers to third

_____

9. The trustee's power to assert a creditor's state law fraudulent transfer
action through section 544(b) stands in sharp contrast to other statutory entitlements in the Bankruptcy Code that do work to the direct benefit of the debtor, not the creditors. One prime example is section 522(f) of the Bankruptcy Code, which permits an individual debtor to avoid certain liens on household goods to the extent that they impair the debtor's property exemption. While debtor protection is the express goal of provisions such as section 522(f), bolstering creditors' rights is the primary objective of avoidance powers such as section 544(b). See Thomas H. Jackson, Avoiding Powers in Bankruptcy , 36 STAN. L. REV. 725, 730 n. 16 (1984). See generally Citicorp Acceptance Co. v. Robison (In re Sweetwater), 884 F.2d 1323, 1329 (10th Cir. 1989) ("All of the avoiding powers have the policy of fair treatment among creditors at their base. . . . The theoretical underpinning of all of them remains the equal treatment among creditors by forcing those who have received an unfair advantage to disgorge the ill gotten gains.") (citing R. Aaron, BANKRUPTCY LAW FUNDAMENTALS S 10.01 (Rev'd 1999)).

parties. In Briggs v. Kent (In re Professional Inv. Properties of America), 955 F.2d 623, 626 (9th Cir. 1992), the Court of Appeals for the Ninth Circuit stated it was faced with the issue of whether a trustee's so-called strong-arm powers provided by section 544(a) were "transferrable" to a creditor who purchased the estate's right to certain sale proceeds. The Court then decided, however, that "if a creditor is pursuing interests common to all creditors or is appointed for purposes of enforcement of the plan [of reorganization], he may exercise the trustee's avoidance powers." Id. at 626 (emphasis added). This holding was reaffirmed and extended to the context of a chapter 7 case in Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.), 177 F.3d 774, 782 (9th Cir. 1999).10 Appellees cite these cases as standing for the proposition that avoidance powers may be sold. We do not necessarily agree with their assessment of these cases, but we need not reach this issue because the 1996 transaction was not an assignment of avoidance powers (or even an authorization of the right to exercise the avoidance powers), but rather, it was a sale of Cybergenics' "assets."11 As we have already determined, neither the fraudulent transfer claim nor the avoidance power was an asset of Cybergenics. Clearly, therefore, that fact pattern bears no resemblance to the situation in the instant case. We similarly find little relevance in the cases cited by the parties from various courts of appeals that deal with the appointment of estate representatives in a plan of

_____

10. In P.R.T.C., the Court of Appeals upheld an express assignment to the debtor's largest creditor to pursue a variety of claims and rights actionable under Bankruptcy Code sections 541 through 552 arising out of a series of specified transactions. Id. at 776. The trustees proposed the assignment after concluding that the estate lacked sufficient funds to pursue those claims or rights, but believed that they might have significant value. The creditor was required by the agreement to remit to the bankruptcy estate 50% of the net proceeds in the event that the creditor pursued the claims.

11. Had the sale order explicitly provided for the assignment of the avoidance powers, we would have no occasion to scrutinize its legality at this juncture, as the sale order was never appealed and has long since been consummated. See Pittsburgh Food and Beverage, Inc. v. Ranallo, 112 F.3d 645, 650 (3d Cir. 1997).

13

reorganization based on section 1123(b)(3)(B) of the Bankruptcy Code.12

Based on the foregoing analysis, we reach the inescapable conclusion that the fraudulent transfer claims, which state law provided to Cybergenics' creditors, were never assets of Cybergenics, and this conclusion is not altered by the fact that a debtor in possession is empowered to pursue those fraudulent transfer claims for the benefit of all creditors. The avoidance power itself, which we have analogized to the power of a public official to carry out various responsibilities in a representative capacity, was likewise not an asset of Cybergenics, just as this authority would not have been a personal asset of a trustee, had one been appointed. Thus, we conclude that the fraudulent transfer claims asserted in the Committee's complaint were not sold in the 1996 asset sale.

Although it is not a basis for our reasoning or result, we note that if the fraudulent transfer claim had been an asset of Cybergenics, it should have been reflected as an asset on Cybergenics' bankruptcy schedules. It was not so listed. See Voluntary Petition of Cybergenics, 96–37203 Schedule B.13 It is also curious that there is no evidence in the record

_____

12. Section 11 U.S.C. S 1123(b)(3)(B) of the Bankruptcy Code permits a plan of reorganization to designate a representative to enforce certain claims, such as avoidance claims, for the estate's benefit. See, e.g., Retail Marketing Co. v. King (In re Mako, Inc.), 985 F.2d 1052, 1055–1056 (10th Cir. 1993) (refusing to allow a "stranger to the estate" to bring an avoidance action without clear evidence of the reservation of the avoidance power for that party and explaining that postconfirmation avoidance actions are to be exercised for the benefit of all creditors); Citicorp Acceptance Co. v. Robison (In re Sweetwater), 884 F.2d 1323, 1327–1328 (10th Cir. 1989); McFarland v. Leyh (In re Texas General Petroleum Corp.), 52 F.3d 1330, 1335 (5th Cir. 1995). The instant appeal clearly involves no plan of reorganization and there is no suggestion that the purchaser of Cybergenics' assets is acting as, or wishes to be appointed to act as, a representative of the estate in any event.

13. It also was not contained on the Statement of Financial Affairs list of all suits to which the debtor is or was a party within one year preceding the bankruptcy filing, although that list includes only those lawsuits that actually have been filed, not inchoate lawsuits. See Statement of Financial Affairs at 8.

14

that the successful purchaser of Cybergenics' assets ever took the position that he bought the fraudulent transfer claims or the power to avoid the transfers provided by the Bankruptcy Code.14

Our reasoning and conclusion are different from that of the District Court. In considering the nature of the fraudulent transfer claims, the District Court focused on when they arose and whether they were transferrable as a general matter, but did not consider the determinative issue of whether they ever belonged to Cybergenics in the first place. The District Court also concentrated on whether the fraudulent transfer claims were "property of the estate," a term of art under the Bankruptcy Code, see 11 U.S.C. S 541(a), notwithstanding the fact that the sale order and sale agreement authorized the sale of all assets of Cybergenics, not all property of Cybergenics' bankruptcy estate. "Cybergenics' assets" and "property of the estate" have different meanings, evidenced in part by the numerous provisions in the Bankruptcy Code that distinguish between property of the estate and property of the debtor, or refer to one but not the other.15 See also In re Doemling, 127 B.R. 954, 957 (W.D. Pa. 1991) ("Obviously, after the commencement of the case, the estate has an existence that is completely separate from that of the debtor."); Thomas E. Plank, The Outer Boundaries of the Bankruptcy Estate, 47 EMORY L. J. 1193, 1215 n. 94 (1998).

_____

14. Neither Cybergenics nor the purchaser is a party to this appeal.

15. Examples include sections 362(a)(3), (4) & (5) (separately protecting property of the debtor and property of the estate with the automatic stay), section 541(a)(7) (providing that property of the estate includes interests in property acquired by the estate itself following the commencement of the bankruptcy case), section 543(a) (preventing a custodian from taking action in the administration of property of the debtor or property of the estate), and section 552(a) (limiting effect of security interests in property acquired postpetition by the estate or by the debtor). Further bolstering this distinction by negative implication, property of the estate is separately and distinctly defined for purposes of
chapter 9 municipal bankruptcy cases to mean property of the debtor. 11 U.S.C. S 902(1). See also id. S 1306(a) (defining property of the estate,
for purposes of chapter 13 only, to include the debtor's postpetition earnings).

Issues relating to property of the estate are simply not relevant to the inquiry into whether the fraudulent transfer claims in the Committee's complaint were assets of Cybergenics as debtor or debtor in possession.16 Accordingly, we reject the District Court's analysis and conclusion.

For the foregoing reasons, we will REVERSE the order of the District Court.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit
_____

16. Even if we agreed that an analysis of property of the estate was necessary to resolve this dispute, our outcome would not change due to the cause of action at issue here. Subject to a few specifically enumerated exceptions, the bankruptcy estate contains only the interests of the debtor in property as of the time of the bankruptcy filing,
"no more, no less." In re Jones, 768 F.2d 923, 927 (7th Cir. 1985) (citation omitted). As we already have explained, the fraudulent transfer action belonged to Cybergenics' creditors as of the time of the bankruptcy filing. It bears emphasis that we focus here on the cause of action to avoid the transfer, not on any sort of"equitable interest" that some courts have said may be retained by a debtor in fraudulently-transferred property. See, e.g., Cullen Center Bank & Trust v. Hensley (In re Criswell), 102 F.3d 1411, 1417 (5th Cir. 1997) (citing Mortgage America, 714 F.2d at 1275). That issue is not before us in this case, and we must take care not to conflate these two distinct questions. In addition, although at least one Bankruptcy Court-- and the very judge who presided over Cybergenics' bankruptcy case -- has stated that the avoidance power provided by the Bankruptcy Code is, itself, property of the estate, see In re Becker, 136 B.R. 113, 116 (Bankr. D. N.J. 1992), this is hardly a universally accepted view. See, e.g., In re Saunders, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989); 5 COLLIER ON BANKRUPTCY P 541.14 n. 1 (Lawrence P. King, ed., 1999) (stating that avoiding powers are not property of the estate, but, rather, statutorily created powers to recover property).