In re **NARTRON CORPORATION,**
Debtor.

No. SG 02–14263.

United States Bankruptcy Court,
W.D. Michigan.

Aug. 26, 2005.

Lawrence Korolewicz, Tolley Vandenbosch Walton Korolewicz and Brengle PC, Robert F. Wardrop, II, Wardrop & Wardrop, P.C., Grant J. Gruel, Gruel, Mills, Nims & Pylman, Grand Rapids, MI, Kenneth F. Neuman, Nathan Neuman & Nathan PC, Robert C.J. Tuttle, Brooks & Kushman PC, Southfield, MI, Stephen J. Schultz, Watts, Hoffman, Fisher & Heinke, Cleveland, OH, Noah E. Yanich, Rochester Hills, MI, Jay N. Siefman, Farmington Hills, MI, for Debtor.

## OPINION

JO ANN C. STEVENSON, Chief Judge.

The principal issue before this court is whether cause exists or it is in the interests of the creditors, equity security holders and the bankruptcy estate to appoint a Chapter 11 trustee.

The question presented in this Motion arises in a case referred to this court by the Standing Order of Reference entered by the United States District Court for the Western District of Michigan on July 24, 1984. The bankruptcy court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Accordingly, the bankruptcy court is authorized to enter a final judgment subject to those appeal rights afforded by 28 U.S.C. § 158 and Fed. R. Bankr.P. 8001 et. seq.

The following constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052. In reaching its determinations, this court has considered the demeanor and credibility of all witnesses who testified, the exhibits properly admitted into evidence, the parties' briefs and opening and closing arguments.

The court also notes that counsel for Alticor Corporation, Norman Rautiola (Rautiola) and Nartron Corporation were extremely well prepared and zealous in the pursuit of their clients' positions. All parties did an extraordinary job in diligently and meticulously presenting their case.

### The Beginning

"Mighty things from small beginnings grow." John Dryden (1631–1700)

During the tumultuous 1960's, at a time when the status quo was being questioned through anti-Vietnam War sentiment and the rioting for civil rights; and while America's youth was being encouraged to "think for yourself and question authority,"[1] Norman Rautiola a 36–year–old engineer, decided to do just that. Leaving his job at Spartan Corporation, he started Nartron Electronics Corporation (Nartron or the Company)[2] in Jackson, Michigan.

Nartron was originally established as a research and development center, but quickly expanded into manufacturing, moving to Reed City, Michigan in the summer of 1968. Through clever observation and business expertise, Rautiola decided that the key to success was to build and design everything in-house. He believed that by optimizing the design of every component

---

1. Timothy Leary, (1920–1996) American Psychologist and Author

2. The name Nartron Electronics Corporation was eventually simplified to Nartron Corporation.

that goes into a product, he could enhance the end product.

This strategy worked extremely well and Rautiola became known as an entrepreneur and innovator within the automotive and electronic fields. Throughout the years, Rautiola was accorded Senior Member status by the Institute of Electrical and Electronic Engineers and in 2002 Nartron was named one of America's "Innovation 50" companies by INC Magazine.

Under the stewardship and ingenuity of Rautiola, Nartron successfully developed and produced high-end electronic products, such as the first electrically powered steering system, the first keyless automobile entry system, the first touch-controlled range, the first electronic lamp dimming system, and more recently, a "smart-power window" for the automotive industry that senses an object in its path. Nartron has also developed a clear vision safety product, that provides hot washer fluid that keeps a car windshield clear of ice in the winter and bugs in the summer.

Due to the war in Iraq, Nartron has expanded its development and manufacturing into safety items for the military. One such product is a system that can start a diesel vehicle quickly, and another is a safety system enabling a vehicle convoy to signal its maneuvers to the rear or side.

### Nartron and Amway Do Business
"Trust can be a powerful weapon." Unknown

Sometime in 1987, Nartron and Amway Corporation (Amway) initiated discussions for the mutual disclosure of certain technical information, as well as non-disclosure of such information to third parties, incident to the development of a device which would signal the end of the useful life of a carbon filter in a water treatment system. An agreement was executed on August 18, 1987 and then again on September 21, 1987 for Nartron to develop such a device for Amway.

From the beginning of the joint Nartron/Amway project, representatives from both companies met and exchanged technical and related information and assistance on what came to be known as an end-of-life indicator (EOLI).

On April 21, 1988, Nartron formally proposed a three-phase development program to Amway for product completion, panel test units and product finalization for production along with price quotations.

Nartron's design and development of the EOLI continued, and on June 13, 1988, Nartron submitted a disclosure of the product to its patent attorney in order to secure the patent rights thereto.

Meanwhile, following continued discussions between each company's representatives, Amway proposed the terms of the purchase order. The June 20, 1988 proposal called for Nartron to refrain from seeking patent, design or other protected rights for the EOLI. It also required that any and all protected rights to that property belong solely to Amway.

Protracted negotiations took place on the proposed sale terms, especially concerning the patent rights. Nartron submitted its counter offer to Amway's initial proposal stating that all patents for work done on the EOLI would remain the sole property of Nartron, but Amway would be granted a fully paid license for its use. Amway responded by insisting that it receive the patent for the design, but that it would not impede Nartron from the continued use of the design features for re-application to other products.

A formal offer was finally proposed by Amway on June 30, 1989, in which Nartron was to give Amway ownership of all rights

to patents and other protections that arose solely from the development of the EOLI.

Rautiola and Richard J. Pluta, Nartron's Vice President for Product Development, met and discussed Amway's offer. In a memo dated July 13, 1988 and attributed to Rautiola, the strategy for obtaining a patent for the specific device and/or the specific embodiment of the device was outlined. Rautiola stated: "Once we have the patent on this product, that is our protection. As soon as they buy from somebody else we sue."

Nartron accepted the proposed purchase order, which was memorialized on August 10, 1988 (the August 10, 1988 Purchase Order). Throughout all discussions, negotiations and formalization of the agreement, Nartron never mentioned its previous disclosure to its patent attorney.

Nartron proceeded with the first phase of the product which was completed and accepted by Amway on August 26, 1988. Nartron delivered phase two of the product, the panel test units, to Amway in June of 1989.

Amway proceeded with the tests and noted certain performance problems. These problems persisted through the end of 1989 and into early 1990.

On December 8, 1989, Nartron filed a patent application for the EOLI which was subsequently issued. Even after receipt of the patent, as late as December 21, 1989, Nartron continued to revise and submit different price quotations to Amway.

Shortly thereafter, in meetings between company representatives, Nartron disclaimed any and all obligations under the August 10, 1988 Purchase Order and the final two phases of the contract were never satisfactorily completed. In March of 1990, as a final act of repudiation, Nartron participated in the Society of Automotive Engineers' (SAE) yearly convention in Detroit. There, it displayed and offered for sale the technology embodied in the EOLI.

*The Long and Winding Litigious History Between Nartron and Amway/Alticor*

"Hate traps us by binding us too tightly to our adversary." Milan Kundera (1929–)

Nartron was the first to file suit in Osceola County Circuit Court on March 19, 1990 (the State Court Case). In its complaint, Nartron alleged that the parties never entered into a contract and that Amway was unjustly enriched. In response, Amway filed a counterclaim seeking enforcement of the parties' confidentiality and development agreements.

While the State Court Case was pending, Amway filed a declaratory judgment action in the United States District Court for the Western District of Michigan (the Federal Court Case), seeking to have the patent obtained by Nartron on the EOLI declared invalid.

The Honorable Richard A. Enslen entered summary judgment against Nartron in the Federal Court Case on December 15, 1992. He held that the patent assigned to Nartron was invalid based upon Nartron's prior actions. Nartron appealed.

In October of 1993, the liability phase of the State Court Case took place. Proofs were closed and The Honorable George Van Kula took the matter under advisement. Judge Van Kula had previously determined that there would be a separate trial on any and all damages once an opinion on the liability issue was rendered.

Meanwhile, on appeal, the Sixth Circuit vacated Judge Enslen's Summary Judgment Order in the Federal Court Case remanding the case for further proceedings. Discovery resumed in January of 1994.

Once discovery was closed, Amway renewed its Motion for Summary Judgment of the patent invalidity and the Motion was granted. Nartron appealed but subsequently dismissed its appeal.

Back in the State Court Case, in an Opinion dated February 5, 1995, Judge Van Kula found that Nartron had repudiated its agreement with Amway relating to the EOLI; that Nartron breached the confidentiality agreements and the August 10, 1988 Purchase Order; and that Nartron misappropriated trade secrets by exhibiting the EOLI at the SAE show and filing a patent application for the product. Nartron appealed.

The damage phase of the State Court Case began on March 6, 1996. Amway's lost profit claim was dismissed on a Motion for Summary Judgment. As for the balance of the damage claim, the court, in its Corrected Judgment, ordered Nartron to pay Amway $878,688.00 plus pre-judgment interest of $556,620.66 and costs. Nartron filed an appeal. Amway cross-appealed the dismissal of the lost profits claim.

In an opinion dated October 12, 1999, the Michigan Court of Appeals affirmed the state court findings of liability; reversed some of the damages and cost findings; vacated a trade secret damage award and expert witness cost, calling for further findings; and reversed the dismissal of Amway's lost profits claim, remanding that issue to Osceola County Circuit Court. Nartron paid Amway the portion of the judgment that was affirmed.

### Richard J. Pluta's Betrayal of Nartron and Rautiola

"Resentment is like taking poison and waiting for the other person to die."
Malachy McCourt, (1931–)

Once both phases of the State Court Case were tried and decided, Nartron sued Richard J. Pluta (Pluta). Pluta's involvement in the litigation between Amway and Nartron began when, in preparation for the State Court Case and the Federal Court Case, Amway interviewed Pluta as Nartron's former Vice President for Product Development and a key party to the contract negotiations. At the time of these interviews, Pluta was no longer employed by Nartron.

Pluta consequently executed a damaging affidavit in the Federal Court Case outlining Nartron's questionable activities concerning the EOLI. Judge Enslen's decision against Nartron in the Federal Court Case was based at least in part on Pluta's affidavit.

After seeing Pluta's affirmations in his affidavit, taking several depositions in both the State Court Case and the Federal Court Case, and upon hearing Pluta's testimony in both cases, Nartron determined that Pluta's actions were disloyal and dishonest, and Amway's Counsel had acted in bad faith.

As the full extent of Pluta's and Amway's alleged duplicity were claimed to be unknown to Nartron at the time of the State and Federal Court Cases, in March of 2000, Nartron moved the Osceola County Circuit Court to reopen the judgment; for an evidentiary hearing; for relief from the judgment; and a new trial, all based upon fraud by Amway's counsel and Pluta. Specifically, Nartron alleged that Amway's counsel and Pluta perpetrated fraud on the court through deliberate misrepresentations and omissions. The allegations were based upon Amway's relationship with Pluta prior to and during the trial.

Even though the case filed separately against Pluta was subsequently dismissed with prejudice by Nartron on October 21, 2002, the allegations against him in the State Court Case had taken on a life of

their own. Nartron first wanted to reopen the State Court Case to further examine Pluta in June of 1994. This request was rejected by Judge Van Kula in his February 5, 1995 Opinion. Nartron's allegation that Pluta changed his testimony regarding a crucial point of the meaning of a term in the contract was also dealt with in the February 5, 1995 Opinion.

In his February 11, 2005 Opinion, Judge Root stated that Nartron's allegations of fraud by Pluta and Pluta's alleged disloyalty were irrelevant. Judge Root further determined that all allegations of fraud made by Nartron regarding Pluta and the rulings thereon were found to have res judicata effect.

*Nartron's Problems With General Motors*
"Delusions, errors and lies are like huge, gaudy vessels, the rafters of which are rotten and worm-eaten, and those who embark in them are fated to be shipwrecked." Buddha (563–483 B.C.)

As if Nartron's legal troubles with Amway were not enough to last a lifetime, during this same time Nartron was also embroiled in litigation with General Motors (GM). Although the details of this litigation are of marginal relevance, the result of the litigation is critical.

Nartron filed suit against GM in 1994 seeking recovery for damages as a result of cancelled contracts and the failure to perform agreements by GM. Nartron sought damages in excess of $10 Million.

As a result of discovery omissions and misconduct attributed primarily to Rautiola, GM obtained a judgment for discovery sanctions against Nartron in excess of $4 Million. Nartron's claim against GM was also dismissed as part of the sanctions imposed by the trial court. Nartron sued

its attorneys for malpractice and appealed the state court judgment. Unable to post the necessary stay bond to hold off GM from collecting the judgment, Nartron promptly filed bankruptcy.

On January 6, 2005, notwithstanding the bankruptcy[3], the Michigan Court of Appeals found that the trial court erred in granting pre-judgment interest to GM and reduced the award by $1,708,515.77. This amount has yet to be returned to the bankruptcy estate. That decision was not appealed.

*The Bankruptcy*
"An eye for an eye makes the whole world blind." Mahatma Gandhi (1869–1948)

Nartron filed Chapter 11 on December 19, 2002. At the time of the petition, in addition to holding off GM's collection efforts on the state court judgment and appealing that decision, Nartron was in the process of suing its attorneys, Varnum, Riddering, Schmidt & Howlett, (Varnum) for malpractice; awaiting a trial schedule in the State Court Case regarding the remanded issues of damages and costs, including the trade secret damage award, expert witness costs, and Amway's lost profits claim; and awaiting a decision on its Motion to Reopen the Judgment, an Evidentiary Hearing, Relief from Judgment and a New Trial based on Fraud by Amway's Counsel and Pluta, also pending in the State Court Case. Each of these issues was stayed upon the filing of the bankruptcy.

Another effect of the stay was that the outstanding balance of Amway's claim remained unliquidated. Amway, or Alticor (Alticor) as it is now known, filed a claim in the bankruptcy on June 9, 2003 against

---

3. A Stipulation and Order Granting Relief From Stay was filed on January 8, 2003 authorizing Nartron and GM to proceed with the appeal.

Nartron in the amount of $58,000,000.00. Nartron has objected to that claim.

Nartron filed a Motion for Relief from Stay in order to proceed in Osceola County Circuit Court with the remanded litigation between itself and Alticor.[4] Initially the bankruptcy court denied the Motion. However, after it became clear that the Osceola County Circuit Court was relatively close to a ruling, the bankruptcy court rescinded the Order Denying Relief from Stay and sent the case back to the state court for determination of some of the matters on remand.

The matters sent back to the Osceola County Circuit Court were: 1) Nartron's Motion for an Evidentiary Hearing, Relief from Judgment and a New Trial Based on Fraud by Defendant's Counsel and a Witness; 2) Nartron's Motion for Leave to Supplement the Record on Its Motion for an Evidentiary Hearing, Relief from Judgment and a New Trial Based on Fraud by [Alticor's] Counsel and a Witness; and 3) Alticor's Motion for Entry of Additional Findings of Fact and Conclusions of Law on Trade Secret Liability and Damages.

The bankruptcy court retained jurisdiction of the issue involving the claim of Alticor for increased costs and lost profits which were attributable to Nartron's breach of contract and, another issue remanded by the Michigan Court of Appeals to the state court regarding Alticor's expert witness fees.

Meanwhile in the bankruptcy base case, several plans of reorganization and disclosure statements were filed by Nartron, Rautiola and the Unsecured Creditors' Committee (the Committee). Various parties in interest objected to each plan and no plan or disclosure statement ever came close to being approved.

The Committee filed a Motion to Appoint a Chapter 11 Trustee on April 15, 2004, citing Rautiola's dishonesty, fraudulent conduct, obstreperousness, and failure to meet his fiduciary obligations in the bankruptcy. The Committee also cited Nartron's inability to make any meaningful steps toward reorganization or even to file a confirmable plan.

On May 3, 2004, Amway filed its own Motion to Appoint a Trustee, concurring with the Committee and adding allegations of Rautiola's pre-bankruptcy misconduct. This included Rautiola's habit of signing corporate documents with names other than his own, the existence of secret memos, and Rautiola's mischaracterization of Pluta's role in the Amway negotiations.

Not to be undone, Nartron engaged in lengthy settlement negotiations with Rautiola, GM, Varnum, Alticor and the Unsecured Creditors' Committee. As a result, a settlement was reached with all parties except Alticor. This settlement provided for dismissal of the bankruptcy case, a loan provided by Rautiola to Nartron to effectuate payment in full plus interest of all liquidated claims, and the retention and pursuit of the Debtor's claims and defenses in state court against GM, Varnum and Alticor.

The bankruptcy court approved the proposed settlement agreement and dismissed the case on May 21, 2004. With money provided by Rautiola, Nartron proceeded to pay the claims of GM, Varnum, and all other pre-petition creditors holding liquidated claims. All objections to fee applications were withdrawn and the Committee

---

4. Nartron's position in its Motion for Relief from Stay was indifference as to whether the bankruptcy court retained all or some of the remaining issues, or whether the lawsuit proceeded in state court. It just wanted the litigation to go forward and not be stalled by the bankruptcy stay.

did not pursue its Motion to Appoint Chapter 11 Trustee.

Alticor appealed the settlement and dismissal. On October 26, 2004, District Court Judge Richard A. Enslen, reversed the bankruptcy court's ruling on the dismissal and settlement agreement remanding the case to the bankruptcy court. Nartron and GM appealed Judge Enslen's decision.[5]

A flurry of motions ensued, including Nartron's Motion to Abstain, Nartron's Motion for Relief from Stay, Nartron's Motion to Estimate Claim of Alticor and Alticor's Motion to Appoint a Chapter 11 Trustee.[6]

On January 12, 2005, a hearing was held on Narton's Motion to Abstain. Assured by Judge Root that a decision on the matters sent back to Osceola County Circuit Court was imminent, the bankruptcy court held the Motion in abeyance and postponed the scheduling of other motions until Judge Root's decision was rendered. True to his word, Judge Root issued his decision on February 11, 2005, the date of his retirement from the bench.

In his Opinion, Judge Root denied Nartron's Motion for Evidentiary Hearing, Relief from Judgment and A New Trial, based on the Doctrine of Res Judicata; that the alleged fraud was not extrinsic; and that the Motion was not timely filed. On Alticor's Motion for Additional Findings of Fact and Conclusions of Law, Judge Root found that Alticor possessed trade secrets in its EOLI technology; and that Nartron misappropriated those trade secrets when it displayed the EOLI technology at the SAE Trade Show and when it applied for a patent.

The Court then concluded that the only remaining question was that of damages. It noted that with thousands of pages of documents already in the record, the damage issue could be decided if Alticor would simply and specifically direct the court to the evidence that related to the actual harm suffered by Alticor as a result of Nartron's unauthorized use of the trade secret.

On February 28, 2005, the bankruptcy court produced an Order denying Nartron's motion to abstain and declaring Nartron's motion for relief from stay moot. That Order also scheduled hearings regarding Nartron's Motion to Estimate Claim and Alticor's Motion to Appoint a Chapter 11 Trustee, stating that the interests of the creditors and the Debtor would be better served by proceeding with the bankruptcy case until its inevitable conclusion.

Accordingly, the parties were advised to prepare to continue the Chapter 11 bankruptcy case on two fronts, first with a hearing regarding Alticor's Motion to Appoint a Chapter 11 Trustee, and second with the estimation of Alticor's claim. These issues were to proceed on a parallel track in the bankruptcy court, concurrent with the remaining damage claim issue being heard in the Osceola County Circuit Court as specified in Judge Root's February 11, 2005 Order.

The bankruptcy court ordered Alticor to move forward with the resolution of the damage issue in Osceola County Circuit Court by timely filing the papers necessary to proceed according to the state court order, with a copy to be filed with the bankruptcy court. Alticor complied

---

**5.** The Sixth Circuit dismissed the appeal stating that the order of remand was not final and thus the Court was without appellate jurisdiction.

**6.** The Committee did not renew its Motion to Appoint a Chapter 11 Trustee, in fact at this point it opposed the Motion, siding with Nartron and Rautiola.

with this Order and filed the appropriate pleadings on or about March 30, 2005.

After several discovery disputes, we commenced Alticor's highly contentious Motion to Appoint a Chapter 11 Trustee on May 23, 2005, with closing arguments concluding on July 11, 2005. A status conference was held on Nartron's Motion to Estimate Alticor's Claim on June 13, 2005. The parties have also filed their suggestions regarding the procedure for claim estimation. We are still awaiting a decision from the state court on the trade secret damage claim.

### Alticor's Motion to Appoint a Chapter 11 Trustee

"Scarcely any law [of humanity] is more openly transgressed, or more industriously evaded than that which [commands us] to forgive injuries and prohibits ... the gratification of the desire which every man feels to return pain upon him that inflicts it. Many who could have conquered their anger are unable to combat pride, and pursue offenses to the extremity of vengeance, lest they should be insulted by the triumph of an enemy." Samuel Adams (1722–1803)

In support of its Motion, Alticor focuses on a number of separate acts or transactions which it alleges amount to fraud, dishonesty and mismanagement or other cause by Rautiola as the majority shareholder and CEO of Nartron. Preliminarily, Alticor points to Rautiola's conduct in the GM litigation which was the catalyst for the bankruptcy filing, and his false testimony in the State Court Case.

As for his behavior after the bankruptcy was filed, Alticor argues that Rautiola did not comply with the bankruptcy record requirements, that he paid pre-petition creditors without court approval, hired professionals and filed lawsuits without permission, and has lied to the court in his attempt to cover-up his actions. In addition, Alticor alleges Rautiola failed to list all pre-petition payments to himself and failed to take steps to recover payments on behalf of Nartron. Furthermore, Rautiola has not pursued or preserved avoidable transfers for the benefit of the estate. He has also failed to present a feasible plan of reorganization and purposely orchestrated the disparate treatment of creditors for the sole and vengeful purpose of prejudicing Alticor.

Alticor also maintains that Rautiola has been unable to adapt to the limitations imposed upon businesses and their principals when in bankruptcy, in that he continues to use Nartron as his personal bank. Unaccustomed to getting permission from any higher authority before acting, Rautiola has made decisions unilaterally, some of which involve spending, loaning or borrowing money when, under the Bankruptcy Code, court approval is required. In short, Alticor vehemently asserts that Rautiola can not be trusted.

Conversely, Nartron and Rautiola contend that the Company has remained profitable. The most important factor to consider when determining the need for a trustee, argue Nartron and Rautiola, is not whether current management is perfect, but rather what would be in the best interests of the creditors or the estate. Right or wrong, Rautiola is the heart and soul of Nartron and the Company would have a difficult time surviving without his ideas, tutelage and connections. In addition, the added expense incurred by appointing a Chapter 11 trustee would significantly increase Nartron's financial burden. In summary, Nartron and Rautiola claim that the appointment of a trustee is an extraordinary remedy, and should not be used by

a single creditor whose motives are revenge, retribution, reprisal and retaliation.

Our specific factual findings as to each of Alticor's allegations are as follows:

### Factual Findings

"I am here to make decisions and whether they prove right or wrong I am going to make them." Harry S. Truman (1884–1972)

### Rautiola's Behavior in Pre–Bankruptcy Lawsuits and the Findings Therein

As set forth previously, Alticor and Nartron have been bound together in aggressive, expensive and acrimonious litigation for years. From these lawsuits, various opinions have been rendered. Most germane to the present motion, are the findings regarding Rautiola's activities before and during the State and Federal Court Cases. At various stages, separate courts have made findings regarding Rautiola's veracity. "The ultimate import of the motion [for limited reopening of proofs] is simply a further challenge to Norman Rautiola's credibility. And again, the Court concludes that there is abundant evidence before the Court in that regard." *Nartron Corporation v. Amway Corporation,* File No. 90–005238, p. 2 (Mich.Cir. Ct., Feb. 5, 1995); See also *Nartron Corporation v. General Motors Corporation,* Case No. 94–421–075, p. 1 (Mich.Cir.Ct., Jan. 2, 2001) (Nartron, through Rautiola and the head of the Advanced Product Development section, "intentionally altered relevant and significant evidence" and continued to produce altered versions of the evidence thus requiring dismissal of the case and the imposition of discovery sanctions); *Amway Corporation v. Nartron Corporation,* File No. 1:92:CV:156, p. 15 (W.D.Mich., Sept. 23, 1994) (Contradictions between Rautiola's filed declaration and prior testimony were unexplained).

The findings regarding Rautiola's behavior in the various state and federal court cases and the conclusions made therein are not merely dictum or gratuitous comment, but rather, have formed the basis for the various courts' decisions and are binding in this proceeding.

Also of concern is the continued re-hashing of the Pluta allegations. Robert Tuttle, patent counsel for Nartron spent a large portion of his testimony referring to Pluta and his alleged deception. It is past time to let this issue go. Pluta's actions have been found to be irrelevant. Likewise, we find anything regarding Pluta irrelevant except as an example of how Nartron and Rautiola continue to fight a battle long since over.

### Nartron's Non–Compliance With Bankruptcy Record Requirements

Throughout the hearing on the Motion to Appoint a Chapter 11 Trustee, Alticor repeatedly pointed to specific instances where Nartron had failed to timely file the monthly financial reports (the Monthly Reports) as required by the U.S. Trustee's Operating Instructions and Reporting Requirements for Chapter 11 Cases (UST Operating Instructions).[7]

Alan Beatty, the Certified Public Accountant charged with the duty of filing reports on behalf of Nartron, explained that when the reports were filed within the first months of the bankruptcy, he mistakenly sent them only to the U.S. Trustee. He was unaware that the Monthly Reports were to be filed separately with the court.

Once this was clarified, in May or June of 2003, all "past due" and current Monthly Reports were filed both with the court and the Creditors' Committee. Consequently, we find that all Monthly Reports

---

**7.** There is no dispute that Nartron received a copy of these instructions.

have been timely filed or substantially timely filed.

More troublesome however, were the items included and then not included in the Monthly Reports. Initially included was a "Cash Disbursement Journal" (Journal). This Journal was Nartron's procedure for keeping track of the daily cash on hand.

At some point in late Spring or early Summer of 2003, Rautiola told Nartron's Accounting Department Supervisor to stop including the Journal. The Creditors' Committee was apparently questioning some of the transactions reflected in the Journal, specifically the money being exchanged between Nartron and Rautiola. Once Rautiola issued this directive, the Journal was not submitted as part of the Monthly Reports until December of 2003, after the Creditors' Committee filed a motion to compel Nartron to include it in the Monthly Reports.

Although the exclusion of the Journal may not have been in direct contravention to the monthly reporting requirements as delineated in the UST Operating Instructions, it was a violation of the spirit and purpose of the instructions.

Section 12(a) of the UST Operating Instructions requires that reports be filed by the 20th of each month. Exactly which operating reports are not specifically enumerated. However, Section 12(b) explains the purpose behind the requirement of operating reports.

> The operating reports are used by the United States Trustee to monitor the progress of cases. Also, they enable interested parties to assess whether the business is operating at a sufficient level of profitability to demonstrate feasibility of reorganization.

In addition, the court issued a Definitive Order for Debtor–In–Possession on January 6, 2003 (Court's Definitive Order),[8] which states in pertinent part:

> 9. *United States Trustee.* The debtor shall furnish to the United States Trustee such reports and information as the United States Trustee may reasonably require to supervise the administration of the estate.

Due to the large amount of money flowing between Rautiola and Nartron, the Journal provided the U.S. Trustee and the Creditors' Committee with a more complete and accurate representation of the Company. Even though, Nartron's bank account statements were submitted, Rautiola's were not. This made it more difficult to ascertain exactly what was happening on a monthly basis. If there was nothing to hide, Nartron should have wanted to make the examination of monthly records easy for all involved. The less Nartron has to fight the small battles regarding disclosure, the more energy and resources it has in its struggles against its more formidable foes.

Which brings us to a recurring theme in this bankruptcy case, to wit, the inability or refusal of Nartron's management to recognize that for every choice there is a consequence. Bankruptcy offers certain advantages, but it also exacts a price. Even though the profitability of Nartron has never really been in question, and "reorganization" as used in the bankruptcy sense has not been a goal, Nartron availed itself of the protections of the Bankruptcy Code. Filing comprehensive, accurate and detailed monthly reports, including all relevant bookkeeping records that would reveal the entire picture of Nartron's financial status, is but one small price Nartron should be willing to pay for the safeguard and shelter offered by bankruptcy and the automatic stay.

---

8. There is no dispute that Nartron was served with this Order.

With the firm belief that "the logic of words should yield to the logic of realities,"[9] we find that Nartron's withholding of the Cash Disbursement Journal, although not a violation of the letter of the Court's Definitive Order or the UST Operating Instructions, was an infringement of the essence of the requirements with which Nartron should have been able and willing to comply.

*Rautiola's Payment of Pre–Petition Creditors, Hiring Professionals and Filing Lawsuits Without Court Approval*

Alticor points to several instances of payment to pre-petition creditors and professionals, and the filing of lawsuits without court permission. It specifically alleged the following:

— Nartron was billed several months prior to bankruptcy by various suppliers for services rendered. When these bills were paid post-petition, a notation on the checks stated "advance payment for production material."

— Nartron retained the patent firms of Brooks–Cushman and Watson–Hoffman to maintain, defend and prosecute its many patents around the world. Nartron made several post-petition payments to these firms and others, for professional fees.[10]

— Nartron filed a lawsuit against Gruel, Mills, Nims & Pylman, LLP (the Gruel Firm) on April 29, 2005, alleging legal malpractice in the GM and Varnum litigations.

When asked about these undertakings in violation of the Bankruptcy Code, Rautiola had more excuses than a 16-year-old who has missed curfew. As to the payment of pre-petition creditors, Rautiola stated that they were not intended to be payments of the pre-petition account so much as they were a deposit toward advance payment of post-petition services. He thought he was authorized to pay vendors who threatened to stop supplying production materials.

Rautiola so concluded, even though the Court's Definitive Order states in pertinent part:

3. *Payment of Pre–Petition Debts Prohibited.* The debtor will not pay debts incurred prior to the filing of the petition, including taxes, unless such payments are authorized by this court.

Not to mention, the UST Operating Instructions clearly state:

1f. The debtor may not pay obligations arising before the date of filing of the petition ("pre petition"), except as allowed by the Bankruptcy Code, local rules, or by order of the Court.

In September 2003, Nartron paid Watson–Hoffman maintenance fees for the support of patents so they would not lapse. At first Rautiola stated that they had court permission to make these payments. However, later he conceded that if there was no court approval, then someone in Nartron's Accounting Department paid them by mistake. When Rautiola saw the first order approving compensation for Steven Shultz, an attorney for Watson–Hoffman, filed in January of 2004, he agreed that he must not have had permission to make the payment to the law firm in 2003. This same scenario also applied to payments to the Gruel Trust Account and Brooks–Cushman.

The court is sensitive to the need to protect and maintain Nartron's patents as assets of the estate; however, the Court's Definitive Order specifically states:

---

9. Louis Dembitz Brandeis, Supreme Court Justice (1856–1941).

10. Fees in the amount of $42,611.41 were paid by Rautiola personally during the dismissal period. However Nartron reimbursed Rautiola for these fees.

4. *Payment of Professional Fees.* No fees shall be paid to any attorney, appraiser, accountant, auctioneer, or other professional person retained under § 327 or § 1103 of the Bankruptcy Code unless authorized by order of this court. Likewise, the UST Operating Instructions clearly state:

1e. The debtor may not pay any professionals, such as attorneys, accountants, or appraisers without court order, **even though such payments may constitute general expenses that arise post petition in the ordinary course of business.** (Emphasis added).

As for the lawsuit filed against the Gruel Firm, Nartron first sought approval for the retention of Lawrence J. Acker (Acker) on November 30, 2004. Acker was hired to pursue a malpractice claim against Varnum. The court approved his appointment on January 19, 2004. Since that date, Acker has discovered that Nartron has a legal malpractice claim against the Gruel Firm, with Nartron requesting on July 15, 2005 that Acker be retained to pursue that claim. Alticor objected to this request.

Prior to this request however, a lawsuit was filed by Acker on behalf of Nartron. Rautiola explained that he did not have time to seek bankruptcy court approval before filing the lawsuit because the matter came up within 24 hours of the statutory bar date and to have waited would have meant losing Nartron's claim.

Acker made the highly unusual request for a $50,000.00 retainer fee. Paying him out of his own pocket, Rautiola then requested permission to file an unsecured claim for that amount in the bankruptcy. A hearing was held on August 8, 2005, at which time the court held the matter in abeyance pending the release of this opinion.

Filing lawsuits on behalf of the Debtor is not in contravention of the rules, but, as stated earlier, paying an attorney without court permission is. Even though Rautiola is willing to pay the attorney from his personal funds, his filing of an unsecured claim in the bankruptcy decreases the assets of the estate available to other creditors—specifically to Alticor. This can not be permitted without prior court approval.

Consequently, we find that Nartron failed to follow the Court's Definitive Order and the UST Operating Instructions by paying pre-petition claims and professional fees without court permission.

*Rautiola's Failure to Completely List All Pre–Petition Payments Made by Nartron to Himself*

When Nartron filed bankruptcy on December 19, 2002, the Company's Statement of Financial Affairs [11] reflected two payments to Rautiola within one year of filing. The purpose of these distributions was listed as rent accrued for March and April of that year. Each disbursement equaled $225,000.00.

An Amendment to Schedules F and G, and an Amended Statement of Financial Affairs was filed on June 20, 2003. This Amendment reflected eight additional disbursements to Rautiola, including six additional rental payments each in the amount of $16,800.00, reimbursement of a personal check for $85,000.00, and interest on a note totaling $30,000.00.

During the hearing, evidence was presented showing that in addition to the payments listed on the Schedules, Statement of Financial Affairs and the Amend-

---

11. After the court granted one extension, Nartron filed its Schedules and Statement of Financial Affairs on January 16, 2003

ments thereto, Nartron made pre-petition payments on Rautiola's behalf within one-year of the filing to: the Internal Revenue Service,[12] the State of Michigan,[13] the City of Big Rapids,[14] Lions Oak Ranch,[15] Monticeto Creek Water Company,[16] the Friend of the Court,[17] Stephen Phillips [18] and another payment to Rautiola.[19] None of these expenditures was listed on the Schedules or Statement of Financial Affairs or their Amendments. All of these payments were admitted by Rautiola under oath as being paid pre-petition within the preference period for his benefit. (Transcript, May 23, 2005, Pages 168–187)

It is not uncommon that the initial schedules filed by the Debtor are either inaccurate or missing information, and schedules are commonly amended. The purpose of allowing an amendment is to correct whatever is lacking as the bankruptcy process proceeds and additional information comes to light. The court however, expects and requires full disclosure. This did not happen here.

The sheer number of omitted expenditures, the large amount of money involved, and the fact that all omitted payments were for the benefit of one insider, is confirmation that the Debtor's failure to include complete and accurate information about these pre-petition payments on its Schedules and Statement of Financial Affairs is tantamount to fraud.

*Rautiola's Failure to Recover Payments for Nartron*

Although Rautiola has technically failed to recover payments to creditors on behalf of Nartron, to a certain degree the court has patience with his predicament. Once creditors were paid in compliance with the Dismissal Order, Rautiola, the Debtor and the Committee have been loath to ask for disgorgement. We agree with their decision to forebear, at least until this Opinion is issued. In addition, there has been no formal motion before the court and consequently no written order requiring them to do so.

The court's complacency on this issue is due to the fact that this bankruptcy is atypical. The Debtor is profitable. Money paid to these creditors is being replaced. This is not a situation where assets are being depleted with no hope of replacement and once they are gone, they are gone.

Alticor has argued that Nartron is not as profitable as it seems. In support of this position, Alticor offered the testimony and report of Michael C. Newell (Newell), a principal of CRA International. Newell is an expert in analyzing and valuing businesses, with a primary focus on intellectual property and finances.

To prepare his report, Newell reviewed Nartron's business records, legal pleadings, hearing transcripts, deposition transcripts and public documents. He also

---

**12.** August 5, 2002 in the amount of $35,048.00 and August 27, 2002 in the amount of $87,500.00.

**13.** August 27, 2002 in the amount of $6,000.00

**14.** September 10, 2002 in the amount of $5,777.60

**15.** November 26, 2002 in the amount of $22,353.94

**16.** October 22, 2002 in the amount of $400.00

**17.** Throughout 2002 for thousands of dollars

**18.** Throughout 2002 for thousands of dollars

**19.** October 22, 2002 in the amount of $5,777.60

attended the hearing on the Motion to Appoint Chapter 11 Trustee and reviewed the exhibits. He did not visit Nartron or have access to its premises.

Among other findings, Newell concluded that the Company's machinery and equipment were quickly depreciating and would soon need replacement; wage expenses were most likely unsustainable; receivables would have to be written off; and inventory costs were increasing.

Although we found Newell very well prepared, informative and extremely articulate, we find his testimony marginally relevant. Newell's conclusions were more academic than practical. Newell looked at Nartron on paper and came to various conclusions. These conclusions were contradicted by Rautiola's direct knowledge of Nartron and its business.

We believe that Rautiola is in a better position and is aware of more practical, real-life factors that impact the current and future profitability of Nartron. For example, Rautiola explained that Nartron's equipment must be kept in first-class operating condition because of the zero defect product requirement demanded by its customers. The machinery used at Nartron must produce items consistently accurate at all times. Because of these requirements, the current equipment has been kept in outstanding condition and will not need replacement any time soon.

Rautiola also testified that Reed City has been designated by the Federal Government as a "HUB Zone." The HUB Zone program provides federal contracting opportunities for qualified small businesses located in distressed areas. The program falls under the auspices of the United States Small Business Administration. One qualification necessary to be a "HUB Zone," is a high rate of unemployment. Consequently, although Nartron's wage expenses appear lower on an average, they are in line for the area.

Nartron's inventory has increased in the last year due to its government military contracts. Because Nartron is the only government-approved source for certain products used in the Iraqi War, Nartron is required to have inventory on hand so that products are ready to ship at a moment's notice.

As for the accounts receivable, Nartron provides small discounts of 1/2 % 10 days, net 30. However, a large part of Nartron's customer base is the automotive industry. The payment schedule of the automotive industry is typically 60 days. Therefore, although it would appear that there is a large amount of overdue payments, these conditions are typical when dealing with automobile manufacturers.

In terms of the patent valuations, Newell and Rautiola's testimony are no more than estimates. With no existing written appraisals, the court declines to make a finding that either party's estimates are more accurate than the other's.

Consequently, we conclude that Nartron is sufficiently profitable and that it was not unreasonable for Rautiola to forebear from retrieving payments made to creditors during the dismissal period.

However, payments to insiders within the preference period and unauthorized payments to pre-petition creditors should have been reviewed and moved upon by now. Since Rautiola is the primary insider to receive money, he has understandably been less than motivated to pursue this course of action. Likewise, he is also reluctant to recover monies paid to pre-petition creditors for fear that he will injure relations with them and they will cease sending Nartron the products needed to continue production.

*Failure to Present A Feasible Plan of Reorganization*

Alticor has alleged that Rautiola has failed to present a feasible plan of reorganization. This may be so, but it is not for lack of trying. On May 8, 2003, Nartron filed its first Chapter 11 Plan and Disclosure Statement. The Committee, Alticor and Varnum objected. The Plan and Disclosure Statement were withdrawn on December 3, 2003.

In the meantime, the Committee filed its own Plan on October 21, 2004. Rautiola, Nartron and Varnum all objected. The Committee's Plan and Disclosure Statement were denied by the court on December 3, 2003.

On February 17, 2004, Rautiola filed a Chapter 11 Plan and Disclosure Statement. This was objected to by Varnum, GM, the Committee and Alticor. A hearing was set for May 21, 2004. In the meantime, all parties except Alticor agreed to dismiss the case. This court treated that Dismissal Motion as a Defacto Plan and granted the Motion at the hearing, effectively rendering moot the previous Plan proposed by Rautiola.

When the dismissal was reversed and the hearing on Alticor's Motion to Appoint Chapter 11 Trustee was coming to a close, Nartron and Rautiola filed a Joint Plan of Reorganization. This was held in abeyance until after the rendering of this Opinion.

Between Nartron and Rautiola there have been four proposed plans. Their has been no convincing evidence that these plans were not proposed in good faith. However, in light of the animosity between the parties, their litigious nature, and their inability to agree on anything, the plans are illusory.

In each plan proposed by Nartron and/or Rautiola, Alticor would be paid 100% of its liquidated claim, after estimation. While this sounds reasonable, it is the court's experience that given the continuing animus between the parties, and the credibility issues facing the court, any claims estimation process between these two parties could likely take another fifteen years. This the court will not permit.

*The Purposeful Orchestration of Disparate Treatment of Creditors In Order To Prejudice Alticor*

Although Alticor continues to point to Nartron's Motion to Dismiss as an attempt to damage its position, there has been no showing of any prejudice regarding Alticor's claim or situation as a result of the attempted dismissal of the case. With the entire body of pre-petition unsecured creditors, other than Alticor receiving 100% of their claims plus interest, and with the state court case continuing against Alticor, in hindsight the court can see that dismissal of the bankruptcy could have resulted in possible injury to Alticor.

Given the past history of the parties, the length of time they have been involved in litigation, and the general unpredictability of the future, we cannot readily conclude that once all remaining litigation between the parties was decided and all Nartron's legal fees were paid, which to date, in the bankruptcy alone approach a shocking sum, there would be sufficient assets left to pay Alticor 100% of its claim as ultimately liquidated.

Although we are unable to definitively reject Alticor's argument that Nartron had any nefarious purpose such as prejudicing Alticor when filing the Motion to Dismiss, we can not embrace this notion either.

*Rautiola's Use of Nartron as His "Personal Bank," Rautiola's Spending, Loaning and Borrowing of Nartron's Money, and His Inability to Adapt to Bankruptcy*

For several years Rautiola worked up to 120 hours per week. In the two years

immediately preceding the bankruptcy filing, Rautiola worked over 60 hours per week. After the bankruptcy filing, he worked 60–80 hours a week, without taking a regular pay check. Prior to and after the bankruptcy Rautiola has lent the Company money several times to help it move forward. Rautiola speaks of Nartron as if it is his own child; one that he has conceived, nurtured, and proudly watched grow.

This may not be a case where the principal of a company is simply siphoning assets for his own personal gain. Rautiola is devoted to Nartron and its success. If anything, the distinction in Rautiola's mind between the Company and himself is blurred. This indistinguishable line has much to do with Nartron's success, and were the Company not in bankruptcy, Rautiola's financial conduct would not be subject to scrutiny. Things are different however, once a company seeks protection in the bankruptcy court where the interests of creditors are accorded a higher priority.

Overwhelmingly, the evidence has shown that Rautiola has continued to loan, borrow and spend Nartron's money as if it were his own. An example of this behavior is the manner in which Rautiola would lend the Debtor substantial sums of money and the means by which the loans were to be repaid. All loans were made without promissory notes or even supporting documentation. There was no collateral or security and no repayment schedule.

Another example is the credit card charges for travel to Santa Barbara, California. Numerous store and restaurant charges could not be substantiated as business expenses. It may be true that Rautiola was working throughout the trip, but there was no evidence presented that would support this conclusion.

Explanations of purchases at Walmart, Meijer and Rite Aid for office supplies, defy logic when compared to the amount of money spent. Dollars expended on a yet-to-materialize TV for the employee break room at Nartron, and the payment of cable bills for that TV in an area where cable does not go, leaves this court with little choice but to conclude that Rautiola has the propensity to treat Nartron as an extension of his own pocketbook.

This is not to say he is totally undeserving. But while in bankruptcy there must be a distinct, bright line between the Company and its owner, especially in the areas of finance.

### The Court's Own Observations

"It is reasonable that everyone who asks justice should do justice." Thomas Jefferson (1743–1826)

■ After years of litigation between Alticor and Nartron, the decisions rendered in both state and federal courts throughout Michigan, and this court's first-hand observations of the behavior between the parties, including their attorneys, we could conclude, on the basis of acrimony alone that cause exists to appoint a trustee. "The Code itself does not prohibit the appointment of a trustee based upon the finding of acrimony between debtor and creditor, parties whose interests must be balanced and protected under the discretion of the courts." *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3rd Cir.1998); See also *In re Cajun Electric Power Cooperative, Inc.*, 74 F.3d 599, 600 (5th Cir.1996)

Based upon the debtor-in-possession's institution of several adversarial actions; the parties' inability to reach a consensus about anything; the flinging of accusations at each other; and the failure to demonstrate any ability to resolve matters cooperatively, we conclude that there is no

reasonable likelihood of any cooperation between the parties in the near future. "This is a large and messy bankruptcy that promises to get worse without a disinterested administrator at the helm." *Cajun Electric,* 74 F.3d at 600.

Deep-seeded conflict and animosity between Alticor and the Debtor is at the heart of this bankruptcy case. Alticor's "scorched earth" litigation strategy and the tangled history of these parties' relationship suggests that friction will continue at an unacceptable level. While some degree of antagonism and animosity between a debtor and creditor can be expected in any bankruptcy proceeding, it has reached a particular intensity here which is complicating efforts to move this bankruptcy case forward.

Each party would do well to remember and the court will bear in mind that "whoever arrogates to themselves the right of vengeance shows how little they are qualified to decide their own claims, since they demand what they would think unfit to be granted to another." [20]

### Conclusions of Law

"You can't shake hands with a clenched fist." Indira Gandhi (1917–1984)

 The appointment of a trustee in a Chapter 11 case is an extraordinary remedy, especially here where Nartron is seemingly far from insolvent. If Alticor is to prevail, the right to such remedy must be shown by clear and convincing evidence. *In re W.R. Grace & Co. et al.,* 285 B.R. 148 (Bankr.D.Delaware 2002); *In re PRS Insurance Group, Inc.,* 274 B.R. 381 (Bankr.D.Delaware 2001); *In re Fisher & Son, Inc.,* 70 B.R. 7 (Bankr.S.D.Ohio 1986). The standards by which the appointment

is governed are set forth in 11 U.S.C. § 1104 which states in pertinent part:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement, either before or after the commencement of the case, or similar cause . . . or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . .

 There is a strong presumption in Chapter 11 cases that the debtor-in-possession should be permitted to remain in control of the corporation absent a showing of need for the appointment of a trustee. *In re SunCruz Casinos, LLC,* 298 B.R. 821 (Bankr.S.D.Fla.2003). It is well settled that the appointment of a trustee should be the exception rather than the rule. *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3rd Cir.1989). The corporation's current management is "best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 524 (Bankr. E.D.N.Y.1989). This strong presumption is rooted in the debtor-in-possession's familiarity with the business both before and after the filing of bankruptcy. *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 471 (3rd Cir.1998). Nevertheless, in the appropriate case, the appointment of a trustee is a power which is critical for the court to exercise in order to preserve the integrity of the bankruptcy process and to

**20.** Samuel Adams, Politician and Revolutionary Leader (1722–1803)

592

insure that the interests of creditors are served.

Cases interpreting the scope of the provisions of 11 U.S.C. § 1104 have been ruled upon by a number of appellate courts, although there is no Sixth Circuit authority in this area. However, a review of the appellate decisions reveal commonalities. The decision whether to appoint a trustee is vested in the discretion of the bankruptcy court and will be reviewed on an abuse of discretion standard. The inquiry into whether "cause" exists for such an appointment is not limited to the enumerated list of fraud, dishonesty, incompetency or gross mismanagement, but extends to "similar cause." Factors on which the decision whether to appoint a trustee have turned include: Materiality of misconduct;[21] Evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other creditors or customers;[22] The existence of pre-petition voidable preferences or fraudulent transfers;[23] Unwillingness or inability of management to pursue estate causes of action;[24] Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;[25] Self-dealing by management or waste or squandering of corporate assets.[26]

Subsection (a)(2) creates a flexible standard which allows for appointment of a trustee, even though "cause" may not exist, when so doing would serve the interests of creditors and the estate. Factors which justify appointment of a trustee under this subsection are highly diverse and in essence reflect the practical reality that a trustee is needed to manage the debtor's affairs.

Having fully considered the evidence and applicable authority, this court concludes that Alticor has demonstrated cause for appointing a trustee in this case by clear and convincing evidence.

Nartron is a highly specialized company operating in a technical and sophisticated business. Rautiola founded the company over 25 years ago, and in many respects is its heart and soul. His ideas and their implementation are key ingredients of Nartron's business and its success. Rautiola actively oversees and manages every aspect of the business from product development, to manufacture, to sales, to financial management.

Unfortunately, along the way, Rautiola has made serious mistakes. Both Nartron and Rautiola's counsel eloquently argued that what occurred over the past two years was simply the typical self-interested operation of a business common to many closely-held corporations. Perhaps that is true, but it does not make it right. Especially when the company is in bankruptcy, where many acts that are otherwise acceptable are unlawful when viewed through the prism of the Bankruptcy Code.

Rautiola could have continued forever in the manner in which he was accustomed had he not chosen to seek bankruptcy

**21.** See *Committee of Dalkon Shield Claimants v. A.H. Robins Company, Inc.,* 828 F.2d 239 (4th Cir.1987).

**22.** See *In re Oklahoma Refining Company,* 838 F.2d 1133 (10th Cir.1988).

**23.** See *Sharon Steel,* 871 F.2d at 1228.

**24.** See *Marvel Entertainment,* 140 F.3d at 471.

**25.** See *Cajun Electric,* 74 F.3d at 600.

**26.** See *In re Lowenschuss,* 171 F.3d 673 (9th Cir.1999).

protection. Once that choice was made and Rautiola and Nartron received the benefits of their decision, specifically the protection of the automatic stay, the price exacted for that protection is that the standards for judging the conduct of Nartron's management, mainly Rautiola, were raised and subjected to judicial scrutiny. That conduct from 2002 to the present fails to measure up to the standards necessary to justify continuing present management in unfettered control of all aspects of the Debtor's business.

■ As debtor-in-possession and principal of the corporation, Rautiola owed Nartron and its creditors the highest duties of care and loyalty. Rautiola's actions must be made on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the Company. Business judgments will be respected. However, principals that derive personal financial benefit from a transaction or fail to inform themselves of all material information reasonably available to them, will not receive that protection. See *Sinclair Oil Corp. v. Levien,* 280 A.2d 717 (Del.1971).

In its willful infringement of the patent rights of Alticor, and the discovery abuses in the GM litigation, Nartron's management acted dishonestly, and those acts resulted in a judgment against the Debtor.

■ Rautiola violated the spirit of the UST Operating Instructions and the Court's Definitive Order by obfuscating certain reports from the purview of the United States Trustee and the Creditors' Committee, causing incomplete data regarding the exchange of funds between Nartron and Rautiola. When the Chapter 11 petition was filed, the debtor-in-possession assumed the same fiduciary duties as

would an appointed trustee. These obligations include open, honest and straightforward disclosure to the court and creditors. Rautiola's actions fall far short of this benchmark.

Rautiola has also attempted to skirt the bankruptcy process by paying pre-petition creditors and hiring attorneys without court approval. In making thousands of dollars of pre-petition payments to himself, Rautiola exhibited either incompetent or fraudulent behavior.

Rautiola has not suggested that he is or will be capable of pursuing aggressive, independent investigation of all the transactions at issue, or that he will prosecute litigation to recover assets on behalf of the Debtor. In fact, since he is one potential target of such litigation, it is impossible to believe that he would do so in the manner that a disinterested person would.

Although we have seriously considered the argument that the appointment of a trustee would only create another layer of expense, the court notes that over $1.7 Million in professional fees have already been awarded in this case, to which neither the Debtor nor Rautiola has objected. We look at this as one more indicia of a willingness to expend estate assets regardless of the benefit, while perpetuating a vendetta between two parties that could have been settled long ago.

■ Having concluded that "cause" has been established and that a Chapter 11 trustee is warranted, we also find it appropriate to grant limited powers to that trustee. See *In re North American Communications, Inc.,* 138 B.R. 175 (Bankr. W.D.Pa.1992); *In re G & G Transport, Inc.,* 1998 WL 898835 (Bankr.E.D.Pa.); *In re Madison Management Group, Inc.,* 137 B.R. 275 (Bankr.N.D.Ill.1992).

Although these cases do not fully articulate the statutory basis for the appointment of a trustee with limited powers, an examination of the Code reveals that the statutory basis, beyond the notions of the equity powers or the inherent authority of the bankruptcy court, lies in 11 U.S.C. § 1107 which gives the debtor-in-possession certain rights and powers "subject to ... such limitations or conditions as the court prescribes ... "

■ Similarly, 11 U.S.C. § 1108 provides that "unless the court ... orders otherwise, the trustee [or debtor-in-possession] may operate the debtor's business." Both sections grant the court broad authority to tailor and define the rights of a debtor-in-possession or a trustee if one is appointed to operate the debtor's business.

The circumstances of this case warrant a bifurcation of duties between Debtor's current management and an independent Chapter 11 trustee. Nartron needs Rautiola's expertise in dealing with the operational aspects of the company. This includes all product development, manufacture and sales. Because of Rautiola's efforts, the Debtor offers and produces sophisticated products that are attractive to several large customers.

Complete ouster of Rautiola would be detrimental to creditors and to the bankruptcy estate and would be self-defeating. His continued cooperation is necessary.

Rautiola's behavior which requires the appointment of a trustee has to do almost entirely with the handling of the financial affairs and the litigation strategies of the Debtor. Creditors need, and the integrity of the bankruptcy system demands, a trustee to oversee the financial management of the Company, to investigate and prosecute all estate causes of action, and to estimate Alticor's claim in a reasonable, honest, and efficient manner.

Consequently, the Trustee shall be responsible for all matters such as financial management and accountability, expenditure of estate assets, and ongoing payments, if any, to insiders, and the investigation and litigation of all estate causes of action against insiders or third parties, resolution Alticor's pre-petition unliquidated claim, and if feasible, the filing of a Disclosure Statement and Plan of Reorganization.

As contemplated by 11 U.S.C. § 1104(d) the United States Trustee shall appoint a Chapter 11 Trustee with specific, but limited powers as outlined above. Rautiola, may continue to serve in an operational role and shall report on a regular and timely basis to the Trustee in the manner directed by the Trustee. Any stipulation further defining the Trustee's duties which may be presented by the United States Trustee and/or the Chapter 11 Trustee or any dispute over or clarification of this Order will be entertained by the Court upon the timely filed motion.

### ORDER APPOINTING A CHAPTER 11 TRUSTEE WITH LIMITED POWERS

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. For the reasons set forth in the attached Opinion, Alticor Corporation's Motion to Appoint a Chapter 11 Trustee is granted with limitations;

2. The United States Trustee shall appoint a Chapter 11 Trustee forthwith who shall:

a) oversee the financial management of Nartron Corporation, including the expenditure of estate assets and ongoing payments to insiders;

b) investigate and prosecute any and all estate causes of action against insiders or third parties;

c) participate in the estimation and resolution of Alticor's pre-petition unliquidated claim against Nartron Corporation;

d) if feasible, file a Disclosure Statement and Plan of Reorganization;

3. Norman Rautiola shall oversee operations of the Debtor including:

a) product development;

b) manufacturing;

c) sales;

4. Norman Rautiola shall report on a regular and timely basis to the Trustee in a manner directed by the Trustee and shall otherwise cooperate completely with the Trustee;

This Opinion and Order shall be served pursuant to Administrative Order 2004–06 (Mandatory Electronic Filing) upon Nartron Corporation, Robert F. Wardrop, II, Esq., Norman Rautiola, Geoffrey L. Silverman, Esq., Alticor Corporation, Terry L. Zabel, Esq., Timothy Q. Delaney, Esq., Elizabeth A. Jamieson, Esq., Andrew J. Gerdes, Esq., Daniel Weiner, Esq., Michael V. Maggio, Esq.